980 F.2d 84
 36 ERC 1024, 23 Envtl. L. Rep. 20,132
 SOUTHVIEW ASSOCIATES, LTD., and Southview at Stratton
Partners, Plaintiffs-Appellants,
v.
Ferdinand BONGARTZ, Member, Vermont Environmental Board;
Lixi Fortna, Member, Vermont Environmental Board; Arthur
Gibb, Member, Vermont Environmental Board; Samuel Lloyd,
Member, Vermont Environmental Board; William Martinez,
Member, Vermont Environmental Board; Charles Storrow,
Member, Vermont Environmental Board; Steve Wright, Member,
Vermont Environmental Board; and Elizabeth Courtney,
Chairman, Vermont Environmental Board, Defendants-Appellees.
 No. 1640, Docket 92-7209.
 United States Court of Appeals,
Second Circuit.
 Argued June 4, 1992.
Decided Oct. 30, 1992.
 
 Oakes, Chief Judge, issued opinion on merits of takings and substantive due process claims.
 A. Jay Kenlan, Rutland, Vt. (Abell, Kenlan, Schweibert & Hall, of counsel), for plaintiffs-appellants.
 Jeffrey L. Amestoy, Atty. Gen., Montpelier, Vt. (John H. Hasen, Ronald L. Shems, Asst. Attys. Gen., Waterbury, Vt., of counsel), for defendants-appellees.
 Before OAKES, Chief Judge,* McLAUGHLIN, Circuit Judge, and LAY, Senior Circuit Judge.**
 OAKES, Chief Judge:
 
 
 1
 This appeal requires us to decide whether the denial, pursuant to Vermont's land use statute, Act 250, 10 V.S.A. § 6001 et seq. (1984 & Supp.1991) ("Act 250"), of a permit in respect to a vacation home development in the Green Mountains, gives rise to valid claims for relief under the Fifth and Fourteenth Amendments. Appellants Southview Associates, Ltd. and Southview at Stratton Partners ("Southview") sued the Appellees, the individual members of the Vermont Environmental Board ("the Board"), under 42 U.S.C. § 1983 (1988). Southview claimed that the Board's denial of its application for an Act 250 development permit (1) deprived it of due process of law, (2) denied it equal protection of law, and (3) constituted a taking without just compensation. The United States District Court for the District of Vermont, Franklin S. Billings, Jr., Judge, granted the Board's motion to dismiss Southview's complaint, 782 F.Supp. 279, apparently pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), and Southview now appeals. For the reasons set forth below, we affirm.
 
 I.
 A. Act 250
 
 2
 Act 250 has been a major feature of the Vermont legal landscape for over twenty years. Its enactment represented the culmination of an effort to create a process that would subject subdivisions and other large developments in Vermont to administrative review so as to ensure economic growth without environmental catastrophe. See Governor's Commission on Environmental Control, Reports to Governor 2 (January 1970; May 1970). A brief discussion of the backdrop to the statute's enactment underscores its purpose.
 
 
 3
 Beginning in the mid-1960s, Vermont experienced a massive increase in second-home construction and other recreational development, particularly in the southern portion of the state and around ski areas. Robert K. Reis, Vermont's Act 250: Reflections on the First Decade and Recommendations for the Second 9 (1980); David G. Heeter, Almost Getting it Together in Vermont, in Environmental and Land Controls Legislation 323, 326 (David R. Mandelker ed. 1976); Fred Bosselman & David Callies, The Quiet Revolution in Land Use Control 54 (1971) (prepared for the Executive Office of the President, Council on Environmental Quality); Erickson, The Vermont Environmental Protection Act of 1970, in Environmental Protection 678, 679 (Louis L. Jaffe & Laurence H. Tribe, eds. 1971). These developments shifted economic activity away from agriculture and forestry--the traditional mainstays of the region. Erickson, supra, at 679. The Town of Dover, located in Southern Vermont, provides an example. As one writer explained, in Dover, in 1969, developers were completing, building or planning 19 vacation home subdivisions. According to a regional planner, if all the planned lots had been improved and occupied, the town's population would have increased from 370 to 16,000 within a few years. Id.
 
 
 4
 This spate of development was fueled by several factors, including the construction of interstate highways, the increased popularity of skiing and other outdoor activities, and what might be termed America's fascination with "the country life." See Reis, supra, at 9. Although the development yielded considerable tax revenue and increased property values, at times it threatened to destroy the very base of its existence: Vermont's relatively unspoiled environment. Poorly planned vacation home subdivisions in mountainous areas--typified by steep slopes and thin soil cover--caused soil erosion, water pollution from sewage systems, and a decline in the aesthetic quality of the land. Erickson, supra, at 680; Bosselman & Callies, supra, at 54-55; Heeter, supra, at 327. Public concern over the side-effects of this new and rapid growth reached the high water mark when, in the summer of 1968, the International Paper Company proposed to construct a huge recreational and vacation home development on 20,000 acres of wilderness in the towns of Stratton and Winhall. Governor's Commission on Environmental Control, supra, at 3; Bosselman & Callies, supra, at 54; Heeter, supra, at 328.
 
 
 5
 In May of 1969, then Governor Dean C. Davis responded by creating the Governor's Commission on Environmental Control. Governor Davis charged the Commission with determining how economic growth could be attained without environmental destruction. Heeter, supra, at 329 (quoting opening remarks by Governor Deane C. Davis, Proceedings of the Governor's Conference on Natural Resources 1 (May 14, 1969)). The Commission's recommendations included the enactment of a land use law that would require large developments, including subdivisions, to undergo administrative review prior to construction. Governor's Commission on Environmental Control, supra, at 3-4. This proposal formed the basis of Act 250, enacted by the Legislature in 1970.
 
 
 6
 Not all development projects are subject to Act 250 review. Essentially, an Act 250 permit is required if a person wishes to construct (1) improvements on a parcel or parcels involving more than ten acres located within a radius of five miles; (2) housing projects with 10 or more units located on land owned or controlled by that person within a radius of 5 miles; (3) a subdivision partitioned for resale into ten or more lots within a radius of 5 miles; and (4) improvements above the elevation of 2500 feet. No permit is necessary for construction required for farming, logging or forestry purposes below the elevation of 2500 feet. 10 V.S.A. §§ 6001, 6081(a) (1984 & Supp.1991).
 
 
 7
 A person whose project is subject to Act 250 jurisdiction must file an application with the regional three-person district commission. 10 V.S.A. §§ 6026, 6083 (1984 & Supp.1991). The district commission evaluates the project according to ten criteria relating to: (1) water and air pollution that will result; (2) availability of water to meet the project's needs; (3) the project's burden on the existing water supply; (4) soil erosion that will result; (5) the project's effect on congestion and safety of transportation routes; (6) the burden the project will place on municipal and local government provision of educational and other services; (7) whether the project will have an undue adverse effect on "the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas"; and (8) whether the project conforms with various state, regional and local development plans. 10 V.S.A. § 6086 (1984 & Supp.1991). If the district commission grants the application for a permit, it may attach conditions to it to assure compliance with the criteria for permit issuance. 10 V.S.A. § 6086(c) (1984).
 
 
 8
 A permit applicant may appeal the decision of the district commission to the nine-member Vermont Environmental Board. 10 V.S.A. §§ 6021(a), 6089(a) (1984 & Supp.1991). The Board reviews challenged findings de novo. 10 V.S.A. § 6089(a) (Supp.1991). The permit applicant may, in turn, appeal the Board's decision to the Supreme Court of Vermont, 10 V.S.A. § 6089(b) (Supp.1991), which will uphold the Board's findings of fact "if supported by substantial evidence in the record as a whole." 10 V.S.A. § 6089(c) (Supp.1991); see In re Southview Associates, 153 Vt. 171, 177, 569 A.2d 501, 504 (1989).
 
 
 9
 The Vermont Legislature accompanied the enactment of Act 250 with a statement of legislative intent, which provides, in part:
 
 
 10
 [T]he unplanned, uncoordinated and uncontrolled use of the lands and the environment of the state of Vermont has resulted in usages of the lands and the environment which may be destructive to the environment and which are not suitable to the demands and needs of the people of the state of Vermont.....
 
 
 11
 ....
 
 
 12
 ... it is necessary to regulate and control the utilization and usages of lands and the environment to ensure that, hereafter, the only usages which will be permitted are not unduly detrimental to the environment, [and] will promote the general welfare through orderly growth and development...."
 
 
 13
 Findings and declaration of intent, 1969, No. 250 (Adj.Sess.), § 1, in 10 V.S.A. annotations following § 6001 (1984). Subsequently, in 1973, the legislature further clarified the purpose of the act by adopting a "Capability and Development Plan" to guide the implementation of Act 250. 1973 Capability and development plan; statement of intent and findings, 1973 No. 85, § 7, in 10 V.S.A. annotations following § 6042 (1984). See Norman Williams & Tammara Van Ryn-Lincoln, The Aesthetic Criterion in Vermont's Environmental Law, 3 Hofstra Prop.L.J. 89, 94-95 (1990). The plan states, in relevant part:
 
 
 14
 (2) Utilization of Natural Resources
 
 
 15
 [C]onservation of the recreational opportunity afforded by the state's hills, forests, streams and lakes ... are matters of public good. Uses which threaten or significantly inhibit these resources should be permitted only when the public interest is clearly benefited thereby.
 
 
 16
 ....
 
 
 17
 (6) General Policies for Economic Development
 
 
 18
 In order to achieve a strong economy ... economic development should be pursued selectively so as to provide maximum economic development with minimal environmental impact.
 
 
 19
 ....
 
 
 20
 (10) Recreational Resources
 
 
 21
 The use and development of land and waters should occur in such a way as not to significantly diminish the value and availability of outdoor recreational activities to the people of Vermont, including hunting....
 
 
 22
 ....
 
 
 23
 (11) Special Areas
 
 
 24
 Lands that include or are adjacent to sites or areas of historical, cultural, scientific, architectural, or archeological value ... should only be developed in a manner that will not significantly reduce that value of the site or area.
 
 
 25
 Thus, the Legislature intended Act 250 to protect Vermont's environmental resources with an eye towards maintaining, among other things, existing recreational uses of the land--such as hunting, for example--and preserving lands, when possible, that have special values to the public. In recognition of the importance of economic growth, however, the focus of the Act is not on barring development but on molding it to minimize its environmental impact. And in practice, one commentator has stated that "[t]he statute has ... been administered not as a 'no-growth' law, but as a law designed to improve the quality of growth." Williams & Van Ryn-Lincoln, supra, at 94. We now turn to the dispute before us.
 
 B. Southview's Act 250 Experience
 
 26
 As a threshold matter, for the purpose of this appeal we accept as true the factual allegations set forth in Southview's complaint. See LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir.1991).
 
 
 27
 In March 1982, twelve years after the enactment of Act 250, Southview entered into an agreement with Cersosimo Lumber Co., Inc. ("Cersosimo") to purchase a parcel of undeveloped land for $225,000. The parcel of land contains approximately 88 acres and is located in the towns of Stratton and Jamaica, Vermont, in an area that could be thought of as uplands, at an elevation of about 1600 to 1700 feet, near the world class ski area at Stratton Mountain. The transaction was consummated in June of 1982.
 
 
 28
 Southview purchased the land with the intent to build a 78-lot residential subdivision, replete with approximately 1,500 feet of roads and a community sewage collection, treatment and disposal system. Prior to executing the purchase and sale contract, Southview alleges that it evaluated the property to determine whether any of the land's characteristics would affect Southview's ability to obtain the necessary development permits, including the land use permit required under Act 250.
 
 
 29
 After entering into the $225,000 purchase and sale agreement, under which Southview apparently paid Cersosimo $10,000 down, Southview hired Southern Vermont Engineering Company ("Southern Vermont") to assist in a more rigorous evaluation of the development plan aimed at ensuring that the plan would comply with state and local land use laws, including the statutory criteria of Act 250. As part of its review of the project, Southern Vermont inspected deeryard maps--maps showing winter habitat for white-tailed deer--prepared by the Vermont Department of Fish and Wildlife ("Fish and Wildlife"). These maps did not indicate that any deeryards were located on the Southview property.[1]
 
 
 30
 As the project progressed towards the filing of an Act 250 permit application, Southview learned that a deeryard did in fact exist on the property and that Fish and Wildlife would accordingly oppose Southview's permit application. Southview also reduced the planned number of units to 33 because of limited sewage disposal capacity--a common problem in the formerly glaciated mountainous regions of Vermont. Southview's revised plan called for clustering the 33 units into five areas amounting to 12 acres, developing a total of 23 acres, and leaving the remaining acreage to the homeowner's association, to hold in common and maintain in a managed forested condition.
 
 
 31
 Southview filed an application for an Act 250 permit with the District III Environmental Commission ("the Commission") in March 1985. Several hearings were held from April to December of 1985. In April 1986, the Commission denied the application under Criterion 8(A), 10 V.S.A. § 6086(a)(8)(A) (1984) ("Criterion 8(A)"), because of the adverse effect the project would have on the deeryard.
 
 
 32
 Criterion 8, which addresses the project's impact on the beauty of the area, historic sites and unique natural areas, provides in subdivision (A) that:
 
 
 33
 A permit will not be granted if it is demonstrated by any party opposing the applicant that a development or subdivision will destroy or significantly imperil necessary wildlife habitat or any endangered species, and
 
 
 34
 (i) the economic, social, cultural, recreational, or other benefit to the public from the development or subdivision will not outweigh the economic, environmental, or recreational loss to the public from the destruction or imperilment of the habitat or species, or
 
 
 35
 (ii) all feasible and reasonable means of preventing or lessening the destruction, diminution, or imperilment of the habitat or species have not been or will not continue to be applied, or
 
 
 36
 (iii) a reasonably acceptable alternative site is owned or controlled by the applicant which would allow the development or subdivision to fulfill its intended purpose. (Emphasis added.)
 
 
 37
 The key phrase "necessary wildlife habitat" is defined as "concentrated habitat which is identifiable and is demonstrated as being decisive to the survival of a species of wildlife at any period in its life including breeding and migratory periods." 10 V.S.A. § 6001(12) (1984).
 
 
 38
 The Commission determined that the development would significantly imperil necessary wildlife habitat and that the resultant loss to the public would not be outweighed by the economic, social, cultural, recreational and other benefits to the public that the project would create. This conclusion was based on several findings of fact.
 
 
 39
 The Commission found, and all parties agreed, that the proposed development was situated within a 280 acre deeryard. As the Commission, and subsequently the Board, explained, a deeryard serves as winter habitat for white-tailed deer and plays a central role in the deer's ability to survive the winter--providing the necessary browse and other, more important, requirements for winter survival.
 
 
 40
 Deer endure harsh winter conditions in large part by drawing energy from fat reserves accumulated in late summer and early fall. Browse provides only a secondary source of energy. The deer's capacity to conserve use of its energy reserves is the most critical factor in whether it will survive the winter. The Commission and the Board found that the shelter afforded by an ideal deeryard, like the one on the Southview property, enables deer to minimize the drain on their energy reserves. Protected concentrations of softwood cover provide the best shelter, by (1) blocking cold winds; (2) retaining solar heat and reducing nighttime heat radiation; (3) reducing snow depth (because snow remains on the boughs), thereby reducing the energy deer must use to move around within the deer yard; and (4) shielding deer from human and canine activity, which, if nearby, will cause the deer to stand or move and thereby expend energy. If human activity in close proximity to the deeryard reaches a certain level, deer will abandon the deeryard. See also Leonard Lee Rue, III, The World of the White-tailed Deer 91-118 (John K. Terres ed. 1962) (describing how deer survive the winter).
 
 
 41
 The Commission found that the entire deeryard in question, consisting of 280 acres, is the sole remaining, active deeryard within a 10.7 square mile area.[2] Forty-four acres of the Southview parcel represented one of two of the best "cover areas" within the entire deeryard. The proposed development, located in this 44-acre section of prime habitat, would destroy 10 acres of concentrated softwood cover. The Commission found that Southview's habitat manipulation plan, which included seeding 13 acres to create softwood shelter, would not compensate for the lost softwood because it would take between twenty and forty years for the seedlings to reach the maturity necessary to afford the deer the required shelter.
 
 
 42
 Southview appealed to the Vermont Environmental Board, which denied the permit application in June 1987. The Board first concluded that, as applied to Southview, the "necessary wildlife habitat" language of Criterion 8(A) required it to determine whether the deeryard on the property was decisive to the deer that used it. In so finding, the Board rejected Southview's interpretation, which would have allowed for the destruction of deer habitat provided that some deer survive.
 
 
 43
 The Board, like the Commission, found that the Southview property was within the sole remaining deeryard in a 10.7 square mile watershed. Three hundred acres of deeryard had previously been destroyed in the Stratton area, and what has survived now contains only two primary areas of softwood cover. One of these areas--44 acres of critical softwood cover--is within the Southview parcel, and the proposed residential subdivision, the Board determined, would destroy 10 acres of this critical softwood, while secondary effects from people living in the proposed homes would imperil the remaining 34 acres. The impact on the habitat would result in a loss of deer.
 
 
 44
 The Board concluded that the proposed development would "destroy and significantly imperil necessary wildlife habitat." See 10 V.S.A. § 6086(a)(8)(A) (1984). The Board also held that:[T]he environmental and recreational loss to the public from the destruction and imperilment of the habitat is not outweighed by the economic, social, cultural, recreational, or other benefit to the public from the project.
 
 
 45
 ....
 
 
 46
 ... the loss to the public from the destruction and imperilment of the deer habitat [that this project will cause] is significant.... The existence of the deer in this area provides an opportunity to the public to hunt and to observe deer and provides the more intangible benefit of knowing that the deer exist. The loss of the deer in this area would be significant to the public who benefit from their existence.
 
 
 47
 See 10 V.S.A. § 6086(a)(8)(A)(i) (1984).
 
 
 48
 The Board also found that the development would have far less impact on the deer if Southview situated it on other areas of its 88.5 acre property. In fact, Fish and Wildlife proposed alternative plans for development in other areas of the site. The Board noted that it did not believe that Southview had thoroughly investigated the possibility of less intensive development in other areas of property. The Board concluded that Southview had not "applied all feasible and reasonable means of preventing or lessening the destruction and imperilment of the deer habitat." See 10 V.S.A. § 6086(a)(8)(A)(ii) (1984).
 
 
 49
 Southview next appealed to the Vermont Supreme Court, which affirmed the Board's decision. In re Southview Associates, 153 Vt. 171, 179, 569 A.2d 501, 505 (1989). The Court upheld the Board's interpretation of the term "necessary wildlife habitat," as habitat decisive to the population that depends on it. Id. at 176, 569 A.2d at 503. Having exhausted the possibilities for appellate review of the Commission's denial of its sole permit application, Southview did not attempt to modify the location of the units or otherwise seek to revise its application. Instead, it brought this lawsuit in federal district court.
 
 
 50
 The district court dismissed Southview's claims, apparently pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The court held that Southview had not sufficiently pled either a substantive due process or an equal protection claim. Nor, it held, did Southview's allegations state a claim for a permanent physical occupation. Finally, the court dismissed Southview's claim of a regulatory taking because it was not ripe.
 
 II.
 
 51
 We decide Southview's claims as follows. First, we address its claim that it has suffered a permanent physical occupation of its property. Second, we determine whether Southview's regulatory taking and substantive due process claims are ripe for review and hold that they are not. This ends the opinion for my colleagues. I proceed, however, to discuss the merits of Southview's substantive due process claim and whether the Board's actions have effected a regulatory taking, matters as to which I am stating only my own views.
 
 
 52
 We do agree that the district court's dismissal of Southview's action is a ruling of law which we review de novo. See Austern v. Chicago Bd. Options Exch., Inc., 898 F.2d 882, 885 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990).
 
 A. Permanent Physical Occupation
 
 53
 Southview first argues that the district court erred because it has alleged facts which, if proved, would establish that it has been compelled to submit to a physical occupation of its property. Southview contends that the Board caused this injury by denying its application for an Act 250 permit, and by prohibiting Southview from developing its property in any way that would exclude the deer from the deeryard. These actions allegedly deprive Southview of its right to exclude the deer from its property, which amounts to a physical occupation of the property. Furthermore, Southview contends that this occupation is permanent because the Board has permanently designated portions of its property as a deeryard.
 
 
 54
 If a government has committed or authorized a permanent physical occupation of property, "the Takings Clause generally requires compensation." Yee v. City of Escondido, --- U.S. ----, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992); see also Lucas v. South Carolina Coastal Council, --- U.S. ----, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). Indeed, as Southview correctly points out, if government action constitutes a permanent physical occupation of property, there is "a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982). This type of taking, requiring courts to apply a per se rule, has been termed a "physical taking," see Yee, --- U.S. at ----, 112 S.Ct. at 1527, and stands in contrast to the fact-intensive inquiry accompanying a judicial determination of whether a "regulatory taking" has occurred.[3] Id. --- U.S. at ----, 112 S.Ct. at 1526.
 
 
 55
 Loretto helps define what constitutes a physical taking. In Loretto, the Court reviewed a New York law that required a landlord to permit a cable company to install cable equipment on his building. Loretto, 458 U.S. at 421, 102 S.Ct. at 3168. The Court held that the permanent cable installation on the landlord's building was a permanent appropriation of a portion of the landlord's property and, therefore, constituted a physical taking, even though it displaced only approximately one-half of a cubic foot of property. Loretto, 458 U.S. at 438 & n. 16, 102 S.Ct. at 3177 & n. 16. The Loretto Court explained that a permanent physical occupation occurs when government action permanently destroys the three rights associated with the ownership of property: the power to possess, to use, and to dispose. Id. at 435, 102 S.Ct. at 3175. First, the government (or government authorized) action must deprive the owner of both his right to possess the occupied area and his right to exclude the occupier from possession and use of it. Id. Second, the government action must "forever den[y] the owner any power to control the use of the property," such that he "can make no nonpossessory use" of it. Id. at 436, 102 S.Ct. at 3176. Third, the government action generally leaves the owner with only "the bare legal right to dispose of the occupied space," because the occupier ordinarily renders that right worthless, and "the purchaser will also be unable to make any use of the property." Id. The Court added that absolute exclusivity of the occupation, and absolute deprivation of the owner's right to use and exclude others from the property, were hallmarks of a physical taking. Id. at 435 n. 12, 102 S.Ct. at 3176 n. 12. In setting forth this test, the Court also noted that the injury was "special" because the occupation is by a stranger. Id. at 436, 102 S.Ct. at 3176. In conclusion, the Loretto Court emphasized that its determination that the facts before it constituted a permanent physical occupation was "very narrow," and that states retained "broad power to impose appropriate restrictions upon an owner's use of his property." Id. at 441, 102 S.Ct. at 3179.
 
 
 56
 Two subsequent cases, Yee and FCC v. Florida Power Corp., 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987), confirm the narrow scope of so-called physical takings. In Florida Power Corp., the Court addressed a challenge to the Pole Attachments Act, 47 U.S.C. § 224 (1988), which authorizes the FCC to regulate certain rates utility companies can charge cable television operators who lease utility company poles to carry their television cables. Id. at 247, 107 S.Ct. at 1109. Despite a substantial reduction in rent effected by the FCC regulation, the Court held that no physical taking had occurred because the utility had invited the cable company to lease the poles; no government compulsion existed. Id. at 252-53, 107 S.Ct. at 1112-13. As the Court explained, "required acquiescence is at the heart of the concept of occupation," id. at 252, 107 S.Ct. at 1112, but such required acquiescence was notably absent in the facts before the Court.
 
 
 57
 Government compulsion was also absent in Yee. The Court ruled that an Escondido, California municipal rent control ordinance applicable to mobile home park owners did "not authorize an unwanted physical occupation." Yee, --- U.S. at ----, 112 S.Ct. at 1531. The petitioners, mobile home park owners, claimed that the rent control ordinance rendered the mobile home owners perpetual tenants. They also claimed that the ordinance, in mandating below-market rates, transferred from the park owners, to the existing tenants, an increase in the value of their mobile homes--a gain that the tenants could realize when they sold their mobile homes to new purchasers. In effect, the park owners contended, the ordinance transferred to the tenants "a right of physical occupation of the park owner's land." Id. --- U.S. at ----, 112 S.Ct. at 1528. The Court determined, however, that no physical taking had occurred because the government had not authorized a mandatory physical occupation of the park owner's property. Id. The Court explained that "the government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." Id. No government compulsion was present in Yee because the "[p]etitioners voluntarily rented their land to mobile home owners," and moreover they were not compelled to continue to do so. Id. The Court concluded that, even if the ordinance operated to transfer wealth from the park owners to the mobile home owners, it represented a regulation on the use of the petitioners' property, rather than a per se taking by virtue of a permanent physical occupation. Id. --- U.S. at ---- - ----, 112 S.Ct. at 1530-31.
 
 
 58
 Application of the principles set forth in Loretto, Florida Power Corp., and Yee demonstrate that Southview has not suffered a physical taking. Initially, we note that Southview has satisfied the permanency aspect of a physical taking for the purposes of a Fed.R.Civ.P. Rule 12(b)(6) motion, because it alleges that the Board will continue, permanently, to deny Southview an Act 250 permit that would impair the deeryard. However, Southview has failed adequately to allege the remaining elements of a physical taking.
 
 
 59
 Consider the three components of property rights discussed in Loretto. See Loretto, 458 U.S. at 435-36, 102 S.Ct. at 3175-76. First, Southview has not lost the right to possess the allegedly occupied land that forms part of the deeryard. Southview retains the right to exclude any persons from the land, perhaps by posting "No Trespassing" signs. Southview can even exclude the deer, perhaps with a fence, provided it does so under circumstances that do not require it to obtain an Act 250 permit--such as by the planting of an orchard. Second, Southview retains substantial power to control the use of the property. For example, it could construct improvements involving up to 10 acres of it for any purpose--construction of an inn may be possible--because Act 250 does not apply to development involving less than 10 acres. 10 V.S.A § 6001(3) (Supp.1991). Moreover, according to the terms of Act 250, Southview could engage in "construction for farming, logging or forestry purposes," id., on the entire 44 acres of critical softwood in the deeryard without the need to seek a permit from the Commission.[4] In addition, Southview's owners can, to the exclusion of others, walk, camp, cross-country ski, observe wildlife, even hunt deer on this land--irrespective of whether these activities cause the deer to abandon the deeryard. Third, because all of these uses, and many more, are available to any owner of the deeryard land, Southview's right to sell the land is by no means worthless. The Board's denial of Southview's one application for an Act 250 permit can hardly be said to have "empt[ied] ... of any value" Southview's right to dispose of the 44 acres of deeryard. See Loretto, 458 U.S. at 436, 102 S.Ct. at 3175.
 
 
 60
 Put differently, no absolute, exclusive physical occupation exists. See id. at 435 n. 12, 102 S.Ct. at 3176 n. 12. To the extent the Board has allowed the deer to "invade" Southview's land, this "invasion" is relatively minor, consisting of an occasional, seasonal, and limited habitation by no more than 20 deer.[5] Minor physical intrusions are not physical takings. See id. at 426, 102 S.Ct. at 3171. Indeed, the deer activity displaces only a few sticks in the bundle of rights that constitute ownership. See Oakes, "Property Rights" in Constitutional Analysis Today, 56 Wash.L.Rev. 583, 589 (1981). In any event, no absolute dispossession of Southview's property rights has occurred. See Loretto, 458 U.S. at 435 n. 12, 102 S.Ct. at 3176 n. 12. Under Loretto, there has been no physical taking.
 
 
 61
 Application of the government compulsion requirement--central to the results in Florida Power Corp. and Yee--yields a similar result. In Yee, there was no government compulsion because the mobile home park owners voluntarily rented their land to mobile home owners, and they were not compelled to continue to do so. Yee, --- U.S. at ----, 112 S.Ct. at 1528. The Court considered the park owners' submission to the rent control ordinance, as well as their submission to the resultant alleged physical invasion, to have been voluntary even though the owners were apparently engaged in this business before the ordinance was enacted.
 
 
 62
 Here, even if the Board's action were a permanent physical occupation, there was no government compulsion. Just as the mobile home park owners voluntarily rented their land in Yee and, in so doing, engaged in activity that subjected them to the effects of the rent control ordinance, id., Southview voluntarily proposed to construct a residential subdivision development project, and, in so doing, engaged in activity that subjected it to the Act 250 review process. Moreover, at the time Southview purchased the land it knew that the project would be subjected to Act 250 scrutiny. Denial of the Act 250 permit--foreclosing one configuration of a development plan--represents a regulation of the use of Southview's property, rather than a per se physical taking. See id., --- U.S. at ---- - ----, 112 S.Ct. at 1528-31; see also Kaufman v. City of New York, 717 F.Supp. 84, 94-95 (S.D.N.Y.), aff'd, 891 F.2d 446 (2d Cir.1989), cert. denied, 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990). Accordingly, Southview's physical taking claim was properly dismissed.[6]
 
 B. Ripeness
 
 63
 We next must determine whether Southview's substantive due process and regulatory takings claims are ripe for review. As the district court explained, Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), sets forth a two-pronged test for assessing the ripeness of takings-type claims. The first prong requires the government entity charged with enforcing the regulations at issue to have rendered a "final decision." Id. at 186, 105 S.Ct. at 3116. The second prong requires the plaintiff to have sought compensation if the state provides a "reasonable, certain and adequate provision for obtaining compensation." Id. at 194, 105 S.Ct. at 3120 (quoting Regional Rail Reorganization Act Cases, 419 U.S. 102, 124-25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974)).
 
 1) Applicability of Ripeness Inquiry
 
 64
 Here we examine whether each of the two prongs of the Williamson ripeness inquiry apply to Southview's (1) taking claim; (2) substantive due process claim premised on the theory that regulation has gone "too far"; and (3) substantive due process claim premised on arbitrary and capricious government conduct.
 
 
 65
 Southview first argues that because it has properly alleged a physical taking, and the Williamson ripeness test does not apply to physical takings, see Hall v. City of Santa Barbara, 833 F.2d 1270, 1281-82 n. 28 (9th Cir.1986), cert. denied, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), the district court erred in dismissing its claim under Williamson. We have concluded, however, that Southview has failed adequately to allege a physical taking claim, and instead the denial of the permit amounts to a regulation on Southview's use of its property. Thus, Southview's takings argument represents a regulatory taking claim to which both prongs of the Williamson ripeness test are fully applicable.
 
 
 66
 Southview also argues that its substantive due process claim is immune from ripeness scrutiny. Before addressing the ripeness of this claim, we note that Southview is apparently advancing two distinct substantive due process theories. Under the first, it is well established that a government land use decision may give rise to a substantive due process violation if the decisionmaking process is arbitrary and capricious. Under a second, less developed approach, one to which the Supreme Court has yet to give its imprimatur, "regulation that goes so far that it has the same effect as a taking by eminent domain is an invalid exercise of the police power, violative of the Due Process Clause." Williamson, 473 U.S. at 197, 105 S.Ct. at 3122; see also William B. Stoebuck, Police Power, Takings, and Due Process, 37 Wash. & Lee L.Rev. 1057, 1097-99 (1980) (discussing Fred F. French Investing Co. v. City of New York, 39 N.Y.2d 587, 385 N.Y.S.2d 5, 350 N.E.2d 381, appeal dismissed for want of juris. and cert. denied, 429 U.S. 990, 97 S.Ct. 515, 50 L.Ed.2d 602 (1976)). We next examine each substantive due process theory to determine whether Williamson applies.
 
 
 67
 Contrary to Southview's assertion, a substantive due process claim premised on the theory that a regulation has gone too far is subject to both prongs of the Williamson ripeness test. Such a claim remains premature "until a final decision is made as to how the regulations will be applied" to a landowner's property. Williamson, 473 U.S. at 200, 105 S.Ct. at 3123; see Eide v. Sarasota County, 895 F.2d 1326, 1329 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). Without such a final decision, a court cannot determine adequately the economic loss--a central factor in the inquiry--occasioned by the application of the regulatory restrictions. Unless a final decision has been rendered, it remains unclear just how far the regulation goes. Williamson, 473 U.S. at 199-200, 105 S.Ct. at 3123; Eide, 895 F.2d at 1329; see Lucas, --- U.S. at ---- - ----, 112 S.Ct. at 2925-26 (Statement of Souter, J.). The compensation component of the Williamson test is also applicable to a substantive due process claim predicated on the notion that the regulation has gone too far. Culebras Enters. Corp. v. Rivera Rios, 813 F.2d 506, 515-16 (1st Cir.1987). If the state provides an acceptable procedure for obtaining compensation, the state's regulatory action will generally not exceed its police powers.[7] See id. at 516.
 
 
 68
 Southview's substantive due process claim premised on arbitrary and capricious government conduct, however, is subject to only the final decision prong of the Williamson ripeness test. Unless a court has a final decision before it, it cannot determine whether a claimant was deprived of property and whether the government conduct was arbitrary or capricious. Landmark Land Co. v. Buchanan, 874 F.2d 717, 722 (10th Cir.1989); see Herrington v. County of Sonoma, 834 F.2d 1488, 1494-95 (9th Cir.1987), cert. denied, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989); see also Del Monte Dunes, Ltd. v. City of Monterey, 920 F.2d 1496, 1507 (9th Cir.1990) ("In evaluating the ripeness of due process or equal protection claims arising out of the application of land use regulations, we employ the same final decision requirement that applies to regulatory taking claims."); but see Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1576 n. 11 (11th Cir.1989) (stating, in dicta, that it is "not at all clear" that final decision requirement should apply to substantive due process claim premised on arbitrary zoning decision).
 
 
 69
 However, the second Williamson requirement, that the plaintiff seek an available state remedy, is not applicable to this type of substantive due process claim. Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1404, 1407 (9th Cir.1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). The requirement that a plaintiff seek compensation in state court is, as we discuss below, derived from the Takings Clause, see id. at 1404, to which a substantive due process claim, premised on arbitrary and capricious government conduct, is largely unrelated.
 
 
 70
 In sum, both prongs of the Williamson test apply to Southview's taking claim, as well as to both substantive due process theories, except the compensation requirement is inapplicable to Southview's substantive due process claim premised on arbitrary and capricious government conduct.
 
 2) Final Decision Requirement
 
 71
 Southview next argues that the Board's application of Criterion 8(A) of Act 250 constituted a final decision under Williamson, because given the Vermont Supreme Court's affirmance of the Board's decision, there exists no other avenue for Southview to contest the denial of an Act 250 permit for its proposed development. Southview also contends that once the Department determined that its property was part of a deeryard, the Board decided to bar Southview from using its property in a way that would exclude deer from it. Despite these allegations, Southview cannot show that it has obtained a final decision.
 
 
 72
 In Williamson, a developer claimed that the county zoning commission's denial of approval of his plans for a residential subdivision constituted a regulatory taking. Williamson, 473 U.S. at 182, 105 S.Ct. at 3114. The developer could have sought "variances that would have allowed it to develop the property according to its proposed plat." Id. at 188, 105 S.Ct. at 3117. Based largely on the developer's failure to pursue such variances, the Court found that the developer had not yet obtained a final, reviewable decision--the type of decision that would "conclusively determine whether [the developer] will be denied all reasonable beneficial use of its property." Id. at 194, 105 S.Ct. at 3120. The Court explained the rationale for the final decision requirement as follows:
 
 
 73
 Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause.... this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.
 
 
 74
 Id. at 190-91, 105 S.Ct. at 3118-19 (citations omitted).
 
 
 75
 In addition to Williamson, several other Supreme Court decisions help define the contours of a "final decision." As the WilliamsonCourt explained, in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the plaintiff's taking claim was unripe because, although the city commission had rejected one development plan, "the property owners had not sought approval for any other plan, and it therefore was not clear whether the Commission would deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property." Williamson, 473 U.S. at 187, 105 S.Ct. at 3117 (citing Penn Central, 438 U.S. at 136-37, 98 S.Ct. at 2665-66). And in MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 351-52, 106 S.Ct. 2561, 2567-68, 91 L.Ed.2d 285 (1986), the county Board of Supervisors affirmed the county Planning Commission's rejection of a landowner's subdivision plan. The Court held that, based on the pleadings which revealed that only one subdivision proposal had been submitted and only one had been denied approval, the landowner had failed to satisfy the final decision requirement because the possibility existed that "some development will be permitted." Id. at 352, 106 S.Ct. at 2567.
 
 
 76
 We do not believe that the Supreme Court's recent holding in Lucas undermines the authority of either Williamson, Penn Central, or MacDonald, nor has it any bearing on whether Southview has obtained a final decision.
 
 
 77
 In Lucas, the Court addressed a regulatory taking claim asserted by Lucas against the South Carolina Coastal Council. The Court found Lucas' temporary taking claim ripe despite his failure to use a discretionary "special permit" procedure which may have enabled him to develop his land. The temporary taking claim covered a two-year period. Lucas, --- U.S. at ---- - ----, 112 S.Ct. at 2891-92.
 
 
 78
 The "special permit" procedure, however, did not exist when the taking occurred, nor did it exist when the state trial court found a regulatory taking for which compensation was due. The procedure was implemented only after appeal was taken to the South Carolina Supreme Court. That court found that no taking had occurred and reversed the trial court's ruling on the merits. The Supreme Court of the United States apparently relied on three factors in finding Lucas' claim ripe: (1) the "special permit" procedure was unavailable to Lucas during the period of his alleged temporary taking; (2) the South Carolina Coastal Council stipulated that, during this period, any other efforts to obtain approval for development would have been futile; and (3) the South Carolina Supreme Court's decision rejecting Lucas' taking claim on the merits barred him from seeking relief, in state court, for the temporary taking. Id. --- U.S. at ---- - ---- & n. 3, 112 S.Ct. at 2890-92 & n. 3.
 
 
 79
 Given these factors--particularly the fact that the "special permit" procedure was nonexistent during the relevant period as well as the futility exception to the final decision requirement, see, e.g., Kinzli v. City of Santa Cruz, 818 F.2d 1449, 1454, modified, 830 F.2d 968 (9th Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988)--the Court's determination that Lucas' temporary taking claim was ripe is consistent with Williamson, Penn Central, and MacDonald. Moreover, none of the three factors relied on by the Court parallel the facts before us.
 
 
 80
 Accordingly, we apply Williamson, Penn Central, and MacDonald to the facts at hand and hold that Southview has not yet obtained a final decision. Like the plaintiffs in Penn Central and MacDonald, Southview has submitted, and the Board has denied, only one application for an Act 250 permit. The Board's rejection of Southview's 33-unit subdivision proposal in no way precludes Southview from submitting another proposal, and it is "not clear whether the [Board will] deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property." Williamson, 473 U.S. at 187, 105 S.Ct. at 3117 (citing Penn Central, 438 U.S. at 136-37, 98 S.Ct. at 2665-66).
 
 
 81
 Although Southview argues that submission of another application would be futile on account of the Department's designation of a deeryard on the property, this argument is fatally undercut by the decision of the Board. We can infer from the Board's decision that it would be receptive to a subdivision proposal that placed lots in a different segment of the 88.5 acre property so as to minimize impact on the critical areas of the deeryard. The Board found that "[t]he development would have far less impact on the deer if it were located on other areas of the property." The Board also concluded that Southview had not undertaken all feasible and reasonable means of reducing the development's effect on the deeryard, and it was "not persuaded that the Applicant has thoroughly investigated the possibility of less intensive development in other areas of the site." As in Williamson, where it "appear[ed] that variances could have been granted" to resolve the majority of the Planning Commission's objections to the subdivision plan, Williamson, 473 U.S. at 188, 105 S.Ct. at 3118, here it also appears that Southview can obtain a permit for a subdivision situated on another part of its property. Therefore, it is likely that "some development will be permitted," MacDonald, 477 U.S. at 352, 106 S.Ct. at 2567, even if Southview proposes development that requires further Act 250 review. Although the Board has applied Act 250 to the one particular subdivision proposal in question, it has yet to provide "a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." Williamson, 473 U.S. at 191, 105 S.Ct. at 3119. For these reasons, Southview's taking and substantive due process claims remain unripe.[8]
 
 3) State Court Compensation Requirement
 
 82
 Southview next argues that the district court erred in holding that it failed to meet the compensation prong of the Williamson test. As the district court stated, Williamson requires an owner to seek compensation from the state, prior to asserting a regulatory taking claim, if the state has a "reasonable, certain and adequate provision for obtaining compensation." Williamson, 473 U.S. at 194, 105 S.Ct. at 3120 (quoting Regional Rail Reorganization Act Cases, 419 U.S. 102, 124-25, 95 S.Ct. 335, 348-49, 42 L.Ed.2d 320 (1974)). This requirement stems from the Fifth Amendment, which "does not proscribe the taking of property, it proscribes taking without just compensation." Id. (citing Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 297 n. 40, 101 S.Ct. 2352, 2371 n. 40, 69 L.Ed.2d 1 (1981)). Thus, a landowner "has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." Id. 473 U.S. at 195, 105 S.Ct. at 3120.
 
 
 83
 The Williamson Court found that Tennessee state courts had interpreted state statutory law to allow recovery when restrictive development regulations give rise to a taking. Id. at 196, 105 S.Ct. at 3121. The Court then held that because the claimant had not shown the Tennessee procedure to be "unavailable or inadequate ... until it has utilized that procedure, its taking claim is premature." Id. at 197, 105 S.Ct. at 3122.
 
 
 84
 Subsequent decisions establish that a state compensation procedure will be deemed available and adequate within the meaning of Williamson even when that procedure remains unsure and undeveloped. Austin v. City and County of Honolulu, 840 F.2d 678, 680-81 (9th Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); see Southern Pacific Transp. Co. v. City of Los Angeles, 922 F.2d 498, 505 n. 8 (9th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). In Austin, the court found no Hawaiian cases recognizing an inverse condemnation action, and held that until Hawaiian courts rejected such actions, a plaintiff could not be excused from seeking relief in state court before filing a taking claim in federal court. Austin, 840 F.2d at 681; see also Culebras Enters. Corp. v. Rivera Rios, 813 F.2d 506, 513-15 (1st Cir.1987) (taking claimant required to seek compensation from the Commonwealth of Puerto Rico, given that the Supreme Court of Puerto Rico has discussed the availability of, but has never awarded damages in, an inverse condemnation action); Littlefield v. City of Afton, 785 F.2d 596, 609 (8th Cir.1986) (Plaintiff must seek compensation from the State of Minnesota, "[u]ntil the Minnesota courts have ruled that an inverse condemnation procedure may not be brought or denies damages in such an action.").
 
 
 85
 Southview contends, however, that Preseault v. ICC, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), as well as Williamson, mandate that only a statutory remedy can represent an adequate state compensation procedure. Southview would have us excuse it from seeking compensation in state court because Vermont has no statutory provision for inverse condemnation. Nothing in either Preseault or Williamson, however, states or implies that the compensation procedure need be statutory. We therefore reject Southview's contention that only a statutory compensation scheme can suffice, and we see no reason to depart from the view, expressed in Austin and other cases, of what represents an adequate state procedure for obtaining compensation for a taking. We next examine Vermont law to determine whether it provides such an adequate procedure.
 
 
 86
 Our search of the Vermont Reports has revealed nothing--neither judicial recognition nor rejection of inverse condemnation actions. Nor has Vermont legislated a cause of action for inverse condemnation. Yet Vermont provides a route whereby Southview may seek compensation in its courts.
 
 
 87
 The Vermont Constitution has always provided--and was the first state constitution to do so--that "whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." Vt. Const. ch. 1, art. 2. The Supreme Court of Vermont has relied on this provision to rule favorably on a cause of action for compensation where government has taken private property through physical damage rather than an eminent domain proceeding. See, e.g., Timms v. State, 139 Vt. 343, 344-46, 428 A.2d 1125, 1126 (1981) (awarding damages to landowner, on account of a taking of private property, precipitated by the state's damage to landowner's well); Sargent v. Town of Cornwall, 130 Vt. 323, 328-29, 292 A.2d 818, 822 (1972) (holding that plaintiff stated a cause of action for a taking, for which municipality must compensate, on account of flooding of private property); Griswold v. Town School District, 117 Vt. 224, 224-27, 88 A.2d 829, 829-31 (1952) (holding that plaintiff stated a cause of action for a taking on account of the school district's diversion and appropriation of plaintiff's water supply). Thus, the Vermont Supreme Court recognizes a cause of action for a taking generally, even if it has yet to decide whether recovery can be had for a regulatory taking. These precedents indicate that Southview cannot establish, at this time, that Vermont's procedure is either "unavailable or inadequate." Williamson, 473 U.S. at 197, 105 S.Ct. at 3122. Vermont has an adequate procedure that Southview must use--a suit in state court--before it asserts a section 1983 claim based on a regulatory taking. Because Southview has never sought compensation in the Vermont courts, its taking and substantive due process claims (premised on the theory that the Board has gone "too far") are not ripe.
 
 
 88
 Accordingly, we affirm the dismissal of Southview's regulatory taking and due process claims for lack of ripeness, and for my colleagues this ends the opinion so that anything that follows represents only my own views and not the opinion of the panel.
 
 
 89
 Were we to reach the substantive due process and regulatory claims on the merits--i.e., if our determination on the ripeness issue was in some way erroneous--I would dismiss them on their merits. Thus, I address Southview's next argument, namely, that the district court improperly dismissed its claim that the Board violated its right to substantive due process because the Board's action--denial of an Act 250 permit--deprived it of "fundamental [property] rights without any compelling state interest narrowly tailored to accomplish the purported public purpose." Southview also contends that it alleged sufficient facts to support its claim that the Board acted arbitrarily and capriciously in denying the Act 250 permit. I disagree.
 
 
 90
 1) Arbitrary and Capricious Government Conduct
 
 
 91
 In evaluating a landowner's claim that a denial of a permit for a regulated use of land offends the landowner's right to substantive due process under the "arbitrary and capricious" government conduct theory, a court first asks whether "an entitlement exists in what has been applied for ... instead of simply recognizing the owner's indisputable property interest in the land he owns and asking whether ... government has exceeded the limits of substantive due process in regulating the plaintiff's use of his property by denying the application arbitrarily and capriciously." RRI Realty Corp. v. Incorporated Village of Southhampton, 870 F.2d 911, 917 (2d Cir.), cert. denied, 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989); see also Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 60 (2d Cir.1985) (Because zoning board, even if acting lawfully, was not required to grant zoning approval, plaintiffs "lack any property interest protectible under the Due Process Clause."). This inquiry, the threshold Board of Regents v. Roth entitlement test, stems from the notion that a property right exists in what is sought--in addition to the property interest that exists in what is owned--provided there is a "legitimate claim of entitlement." RRI Realty Corp., 870 F.2d at 915 (citing Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). A landowner has a legitimate claim of entitlement when, "absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." Yale Auto Parts, 758 F.2d at 59.
 
 
 92
 Moreover, RRI Realty Corp. teaches that this test does not turn on the probability that the government authority will approve the use that the landowner seeks. RRI Realty Corp., 870 F.2d at 918. Instead, the central factor is the degree of discretion possessed by the regulating body. Id.; see also Dean Tarry Corp. v. Friedlander, 826 F.2d 210, 213 (2d Cir.1987) (Property owner's expectation of success in receiving planning board approval for his project did not give rise to a cognizable property right on account of the broad discretion that the zoning ordinance conferred on the planning board.) And the requisite "strong likelihood" of approval exists "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." RRI Realty Corp., 870 F.2d at 918. In RRI Realty Corp., we found that the official body at issue, the Village of Southhampton Architectural Review Board, enjoyed wide discretion in passing on design plans on account of its power to "exercis[e] sound judgment and ... reject[ ] plans which, in its opinion, are not of harmonious character because of proposed style, materials, mass, line, color." Id. at 919 (quoting Southhampton, N.Y., Code § 116.33B (1984)). Thus, we direct our attention to the powers of the Vermont Environmental Board to determine whether it lacked the discretion to deny the Act 250 permit--thereby according Southview an entitlement to the permit.[9]
 
 
 93
 The central issue before the Board was whether Southview had met the requirements of Criterion 8(A). Thus, the Board first had to determine whether any party opposing Southview's application had demonstrated that the subdivision would "destroy or significantly imperil necessary wildlife habitat." See 10 V.S.A. § 6086(a)(8)(A) (1984). If the Board answered this question in the affirmative, it also had to decide (1) whether "the economic, environmental or recreational loss to the public from the destruction or imperilment of the habitat" is outweighed by the "economic, social, cultural, recreational or other benefit to the public" that the subdivision would yield, id.; (2) whether "all feasible and reasonable means of preventing or lessening the destruction, diminution or imperilment of the habitat" have been or will continue to be applied, id.; and (3) whether the applicant owns no "reasonably acceptable alternative site" which would "allow the ... subdivision to fulfill its intended purpose." Id. As demonstrated by its decision in this case, the Board may deny a permit if it determines that the applicant's project fails to meet one of these three "subcriteria."
 
 
 94
 These standards conferred considerable discretion on the Board in its determination of whether Southview had met the relevant Act 250 criteria. All parties agreed that the proposed development was in a deeryard. The Board had to decide how the subdivision would affect the deer's habitat, and whether that habitat was "necessary" within the meaning of the statute. Given its finding on these issues, the Board also had to examine the "subcriteria." Application of any one of them--requiring the Board to weigh the public benefit and loss, or make "reasonableness" determinations--would call for the exercise of a large measure of discretion. I would hold that, as in Yale Auto Parts and Dean Tarry, this discretion prevented Southview's "expectation of success from rising to the level of certainty required to give rise to a ... property right" cognizable under the Fifth and Fourteenth Amendments. Dean Tarry, 826 F.2d at 213 (citing Yale Auto Parts, 758 F.2d at 59-60). Thus, my view is that Southview's substantive due process claim must fail.
 
 
 95
 Even if Southview's expectation of receiving an Act 250 permit were sufficiently certain to give rise to a cognizable property right, Southview has still failed adequately to allege a substantive due process violation. On a general level, substantive due process protects against arbitrary government conduct. United States v. Certain Real Property, 954 F.2d 29, 33 (2d Cir.) (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986)), petition for cert. filed (April 20, 1992). In the zoning context, a government decision regulating a landowner's use of his property offends substantive due process if the government action is arbitrary or irrational. See Brady v. Town of Colchester, 863 F.2d 205, 215 (2d Cir.1988); see also Del Monte Dunes, Ltd. v. City of Monterey, 920 F.2d 1496, 1508 (9th Cir.1990). Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with "no legitimate reason for its decision." Shelton v. City of College Station, 780 F.2d 475, 483 (5th Cir.) (en banc), cert. denied, 477 U.S. 905 & 479 U.S. 822, 106 S.Ct. 3276 & 107 S.Ct. 89, 91 L.Ed.2d 566 & 93 L.Ed.2d 41 (1986); see also Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926) (zoning ordinance violates substantive due process only if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare"); Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1409 (9th Cir.1989) ("[M]alicious, irrational and plainly arbitrary actions are not within the legitimate purview of the state's power."), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). In addition, our precedents caution that, although we will not countenance a constitutional violation, federal courts should not become fora for appellate review of "nonconstitutional land use determinations." Brady, 863 F.2d at 215 (quoting Sullivan v. Town of Salem, 805 F.2d 81, 82 (2d Cir.1986)).
 
 
 96
 In support of its claim that the Board acted arbitrarily and irrationally, Southview's complaint alleges that "similar residential subdivisions ... on lands essentially identical in character" to its property "were approved by the District II Environmental Commission," and those developments "destroyed or imperiled Deer Yards identified by the Department." Southview's complaint also alleges that the white-tailed deer "are neither endangered nor threatened species in the State of Vermont" and "in fact, the State, each Fall, encourages the slaughter of an unlimited number of ... deer." These alleged facts, even if proved, would not in my opinion establish that the Board acted irrationally or arbitrarily in denying the permit application.
 
 
 97
 Southview's assertions regarding the treatment of other similar developments are more relevant to a claim of a denial of equal protection,[10] rather than a violation of substantive due process. Nevertheless, if identically situated developments were granted permits, perhaps an inference of arbitrary or irrational conduct might arise. Southview, however, alleged only that "similar residential developments" on "essentially identical" properties were granted permits (emphasis added).
 
 
 98
 Moreover, had Southview amended its complaint to allege that identically situated developments were granted permits, dismissal would still be required. If the Board had " 'at least debatable' " grounds, Shelton, 780 F.2d at 483 (citing Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981)), for distinguishing its action on Southview's application from its conduct with respect to other subdivisions, the Board did not act arbitrarily and capriciously and did not deprive Southview of substantive due process. See id. at 485, 101 S.Ct. at 735. Southview apparently did not assert any arguments, either before the Commission or the Board, regarding the treatment accorded other subdivisions. The Board, therefore, did not specifically compare Southview's proposal to similar subdivisions, and it set forth no grounds for distinguishing the Southview plan from other developments. The Board based its decision on the merits of Southview's project.
 
 
 99
 In so doing, the Board did underscore, however, that the property was situated within the only active deeryard remaining in a 10.7 square mile area, and the development contemplated destruction of 10 acres of the most important habitat in this deeryard. These facts indicate that the Southview project was configured in a way that would inflict very serious damage to a deeryard unique to the area. Thus, these special factors underlying the denial of Southview's permit undermine any inference that the Board lacked "at least debatable grounds" to distinguish the Southview plan from other developments to which permits were allegedly granted. Under these circumstances, I believe it is Southview's burden to allege some facts tending to prove that the Board had no grounds to distinguish the complained of government action from the government treatment of identically situated applicants.
 
 
 100
 Southview's complaint is devoid of any such facts. Southview's bare allegation regarding other developments, without more, hardly precludes the existence of "at least debatable grounds" for distinguishing the Board's denial of Southview's application from the other unnamed residential developments. Therefore, Southview's allegations regarding other developments are, I think, insufficient to enable it to establish a denial of substantive due process. See Shelton, 780 F.2d at 485.
 
 
 101
 Southview's allegations regarding the incongruity of protecting deer habitat in light of the health of the Vermont white-tailed deer population and the State's hunting policy are also insufficient in my opinion. To the extent Southview questions the policy implicit in the protection of deer habitat, Southview's dispute is with Act 250 and the Vermont Supreme Court's interpretation of it, not with the rationality of, or justifications motivating, the Board's denial of its application. It was the Vermont Supreme Court, not the Board, that finally determined that "a 'necessary wildlife habitat' under Act 250 is one that is decisive to the survival" of those members of the species that depend on it. Southview, 153 Vt. at 176, 569 A.2d at 503 (quoting 10 V.S.A. § 6086(a)(8)(A) (1984)). Southview, however, does not challenge the statute.
 
 
 102
 Furthermore, neither the Board's alleged treatment of other developments nor the alleged hypocrisy of protecting deer habitat negate the conclusion that the Board "articulate[d] a rational basis that was indisputably related to the general welfare, [and] there was no question but that the articulated basis was a basis for [the] decision." Shelton, 780 F.2d at 481. Indeed, there is no reason to believe, and Southview has not alleged, that the justifications articulated by the Board were not the sole reasons for its decision.
 
 
 103
 Southview does not dispute that the Board denied the permit because (1) the proposed subdivision was located in the last remaining deeryard in the 10.7 mile watershed; (2) the proposed subdivision would destroy 10 acres of critical softwood cover within the property and imperil the remaining 34; and (3) Southview failed to situate the subdivision on other areas of its property where the development would have had far less impact on the deer. Nowhere does Southview claim that the Board did not rely on these findings in reaching its decision, nor does it dispute the veracity of these findings. Indeed, it agreed that the development was within a deeryard. Nor does Southview allege that the Board acted contrary to the dictates of Act 250 or contrary to any other state law.
 
 
 104
 By contrast, when our Court, as well as other Courts of Appeal, have found an allegation of a deprivation of substantive due process sufficient to warrant an adverse judgment against a governmental body, the plaintiffs have pleaded or presented evidence indicating that the body acted beyond its authority, without justification, or committed other egregious misconduct. See, e.g., Brady, 863 F.2d at 215-16 (If members of town planning and zoning commission "had no authority under state law to revoke [plaintiff's] building permit, to demand that [plaintiff] apply for zoning permits and certificates of occupancy, and to subject him to the overall approval process, then a trier of fact could conclude that there was no 'rational basis' for the [commission's] actions," and therefore it violated plaintiff's substantive due process rights.); Sullivan v. Town of Salem, 805 F.2d 81, 85 (2d Cir.1986) (If town officials refused to issue certificates of occupancy to developer for a reason that was contrary to state law, such a refusal "would constitute a deprivation of property without due process"); Del Monte Dunes, Ltd. v. City of Monterey, 920 F.2d 1496, 1508 (9th Cir.1990) (Plaintiffs properly stated a due process claim by alleging, with supporting affidavits, that the city had approved their 190-unit project but later abruptly rejected the plan for broad conclusory reasons; and that the rejection was actually motivated by political pressure rather than by legitimate regulatory concerns.); Bello v. Walker, 840 F.2d 1124, 1129-30 (3rd Cir.1988) (If plaintiff proves that municipal officials interfered with the municipality's building permit issuance process based on partisan political or personal reasons unrelated to the merits of the permit application, plaintiff would establish a substantive due process violation.), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). Southview's allegations regarding the Board's conduct fail to approach this kind of illegitimate government action. Even if true, the allegations would not demonstrate that the Board's decision was arbitrary, irrational or otherwise lacking in legitimate justification, and accordingly Southview's substantive due process claim should fail on the merits.
 
 
 105
 Were the regulatory claim ripe, I would dismiss it anyway on the ground that Southview's allegations are insufficient to state a claim that the Board has committed a regulatory taking.
 
 
 106
 In determining what constitutes a taking, I would begin with the classic, if vague, formulation provided by Mr. Justice Holmes: "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). In Mahon, Pennsylvania's statute went "too far" by forbidding, under certain circumstances, the mining of anthracite coal when it would cause subsistence of a dwelling, even if the coal company owned the right to mine the coal as well as the right of support of the surface.[11] Id. at 412-13, 43 S.Ct. at 159. Since Mahon, courts have struggled with limited success to devise a principled yardstick for measuring when regulation has reached "too far." See Rose, supra, at 562.
 
 
 107
 The shortcomings of the Mahon approach--shortcomings that still fuel seemingly inconsistent applications of the Takings Clause--were perhaps revealed in Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), decided less than six years after Mahon. In an opinion joined in by Mr. Justice Holmes, the Court examined a Virginia statute that required landowners to cut ornamental red cedar trees, infected with cedar rust, in order to protect apple orchards from the disease. Miller, 276 U.S. at 277-78, 48 S.Ct. at 246-47. Cedar rust did no harm to the infected red cedar trees, but the state-ordered destruction of the trees allegedly caused the plaintiffs an uncompensated five to seven thousand dollar loss in the value of their property. The Court upheld the statute in the face of a taking and due process challenge without even mentioning, much less distinguishing, Mahon.[12] Miller, 276 U.S. at 279-81, 48 S.Ct. at 247-48; see Oakes, supra, at 605-06.
 
 
 108
 Unsurprisingly, in the wake of Mahon, Miller and other cases, the Court has proved unable to arrive at a "set formula to determine where [land use] regulation ends and taking begins." Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); see also Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Instead, the Court "engage[s] ... in essentially ad hoc, factual inquiries" to decide "when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659 (citing Goldblatt, 369 U.S. at 594, 82 S.Ct. at 990); see also Lucas, --- U.S. at ----, 112 S.Ct. at 2893; Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). Even though this inquiry may be "ad hoc," the cases provide some additional guidance. A regulation will not effect a compensable taking if it "substantially advance[s] legitimate state interests" and leaves the "owner [with an] economically viable use of his land."[13] Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); see Keystone, 480 U.S. at 485, 107 S.Ct. at 1242; Nollan v. California Coastal Commission, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987). By contrast, a taking will generally be deemed to have occurred if the regulation authorizes a permanent physical occupation, see Yee v. City of Escondido, --- U.S. ----, ----, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992), or, in the "extraordinary circumstance," Lucas, --- U.S. at ----, 112 S.Ct. at 2894, when regulation "deprives land of all economically beneficial use." Id. --- U.S. at ----, 112 S.Ct. at 2900 (emphasis added).
 
 1) Economic Impact
 
 109
 In deciding whether Southview retains any economically viable use of its land (as opposed to none, the dictionary opposite of "all"), I note that a regulation that forbids a landowner from putting his property to its most economically beneficial use does not, in and of itself, give rise to a taking. See Goldblatt, 369 U.S. at 592, 82 S.Ct. at 989; see also Andrus v. Allard, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) (upholding regulation even though it undeniably "prevented the most profitable use" of the claimant's property). Indeed, "the Court has repeatedly upheld regulations that destroy or adversely affect real property interests." Keystone, 480 U.S. at 489 n. 18, 107 S.Ct. at 1244 n. 18 (citing cases). As Mr. Justice Holmes explained, these losses incurred by landowners reflect the fact that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change." Mahon, 260 U.S. at 413, 43 S.Ct. at 159; see also Andrus, 444 U.S. at 65, 100 S.Ct. at 327 ("[G]overnment regulation--by definition--involves the adjustment of rights for the public good."). With this in mind, I would turn to the economic effect, on Southview, of the Board's application of Act 250.
 
 
 110
 Southview purchased the property at issue for $225,000. Had a permit been granted, it alleges that it would have incurred expenses for construction of roads, sewers and utilities and the like, as well as marketing expenses, totalling $1,155,000.[14] Southview contends that it would have reaped profits of between $2,100,000 and $3,125,000 from the sale of 33 lots--an approximate return on investment of between % 150 and % 225.
 
 
 111
 Moreover, Southview claims that because 44 acres of its land has been designated a deeryard, it is unable to develop its property. It alleges that the Board "deprived [it] of all economically viable uses of that [p]roperty in relation to Southview's reasonable expectations that the [p]roperty would be developed as a planned residential subdivision, and ... further prevented Southview from earning a reasonable return on its investment commensurate with its reasonable investment-backed expectations." Southview also asserts that it made an "extensive effort to reduce the scale of the [p]roposed [d]evelopment to satisfy the concerns" the Board had regarding the deeryard.
 
 
 112
 In assessing whether Southview retains an economically viable use of its land, I would first reject Southview's assertion regarding its "extensive effort" to reduce the scale of its development to satisfy the Board since no facts support this assertion. Indeed the Board found, and Southview does not dispute, that limited sewage capacity required it to scale down its project from 78 to 33 lots.
 
 
 113
 Despite the Board's decision with respect to its application, and the alleged permanent designation of 44 acres of its property as deeryard, the Board's actions have no effect on Southview's ability to use the parcel in a way that does not require Act 250 review. The Board's decision leaves intact Southview's existing ability to 1) construct improvements for farming, logging or forestry, 10 V.S.A § 6001(3) (Supp.1991) (an orchard or a christmas tree farm may be possible); 2) construct residential or commercial improvements "involving" less than ten acres of the property,[15] id., (an inn or private wooded estate, both common usages in the region, may be possible); 3) construct and sell up to nine homes, id., (provided such activity involves less than ten acres); 4) subdivide and sell up to nine lots, 10 V.S.A. § 6001(19); see 10 V.S.A. § 6081 (1984). Finally, Southview can make considerable recreational use of the land. For example, its owners can walk, camp, cross-country ski, snow-mobile, observe wildlife, and even hunt deer on this land.
 
 
 114
 What Southview cannot do, of course, is build the exact residential subdivision for which it sought an Act 250 permit. But neither the Board's rejection of the permit in question nor the alleged designation of the deeryard on its land preclude development of a modified vacation home subdivision subject to Act 250 review. The Board's decision shows that its concern centers on the 44-acre area forested with critical softwood cover. The Board's decision also indicates that it would be receptive to a subdivision proposal that situated the lots away from the critical softwood cover area, or one that reduced the magnitude of the development generally.
 
 
 115
 Eighty-eight acres is a considerable amount of land for the construction of a thirty-three vacation home subdivision, especially one designed like the Southview plan. As we explained, Southview's project contemplated clustering the 33 units into 12 acres, and directly developing only a total of 23 acres. Both Southview's allegations and the Board's findings indicate that Southview could situate a subdivision on its property--similar to the one described in its Act 250 permit application--without directly destroying any of, and minimizing the secondary impact on, the critical 44-acre cover area. Indeed, Southview's original plan left a large portion of the land undeveloped anyway. The Board's decision appears to reflect a favorable disposition towards such a modified proposal.
 
 
 116
 Furthermore, to the extent Southview's reasonable investment-backed expectations have been affected by the Board's actions, Southview could not have reasonably expected that its plans would have been permitted to proceed willy-nilly. Rigorous Act 250 review seems the norm, not the exception. The fact that Southview must now modify the configuration of its subdivision proposal if it wishes to obtain Act 250 approval does not, in my view, unduly interfere with its reasonable investment-backed expectations.
 
 
 117
 Southview's ability to develop its land has indeed been limited. Perhaps the subdivision proposal rejected by the Board was the most profitable configuration possible. However, based on Southview's allegations and the undisputed findings of the Board, I believe that Southview cannot establish that it has been deprived of economically viable use of its land. See Agins, 447 U.S. at 260, 100 S.Ct. at 2141.
 
 
 118
 2) Substantial Advancement of a Legitimate State Interest
 
 
 119
 The inquiry would next focus on whether the Board's actions "substantially advance[ ] legitimate state interests." Nollan, 483 U.S. at 834, 107 S.Ct. at 3147 (quoting Agins, 447 U.S. at 260, 100 S.Ct. at 2141); see Keystone, 480 U.S. at 485, 107 S.Ct. at 1242. The Court has developed no litmus test for identifying a "legitimate" state interest. Nollan, 483 U.S. at 834, 107 S.Ct. at 1242. Instead, as the Nollan Court explained, a wide array of government purposes are deemed "legitimate," including, for example, landmark preservation, scenic zoning, and residential zoning. Id. at 834-35, 107 S.Ct. at 3147. (citing Penn Central, 438 U.S. at 127, 98 S.Ct. at 2660; Agins, 447 U.S. at 260-62, 100 S.Ct. at 2141-42; and Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). To meet the requirement that the regulation "substantially advance" the state interest, there must be a nexus between the prohibition mandated by the regulation and the goal advanced by the state as the justification for the prohibition. Nollan, 483 U.S. at 837, 107 S.Ct. at 3148.
 
 
 120
 Here, on a general level, the Vermont Legislature found that regulation was necessary to control uses of the land that did not serve the needs of the people of Vermont. Findings and declaration of intent, 1969, No. 250 (Adj. Sess.), § 1, in 10 V.S.A. annotations following § 6001 (1984). Accordingly, the legislature sought to permit land uses that were not unduly destructive to the environment and that promoted the general welfare. Id. On a more specific level, the legislature subsequently stated that "conservation of the recreational opportunity afforded by the state's ... forests ... are matters of public good. Uses which threaten or significantly inhibit these resources should be permitted only when the public interest is clearly benefited thereby." 1973 Capability and development plan; statement of intent and findings, 1973 No. 85, § 7, in 10 V.S.A. annotations following § 6042 (1984). The legislature also determined that "[t]he use and development of land and waters should occur in such a way as not to significantly diminish the value and availability of outdoor recreational activities to the people of Vermont, including hunting." Id.
 
 
 121
 Indeed, the government of Vermont has long valued and protected hunting. Since the adoption of the Vermont Constitution by the Republic of Vermont in 1777, Vermonters have had a constitutional right to hunt. Vt. Const. ch. II, § 67. And the tens of thousands of people who hunt in Vermont, both Vermonters and visitors from other states, would likely identify white-tailed deer as the most prized big game animal in the State. In order to preserve the deer herd for future generations, the State has enacted laws and promulgated regulations regarding hunting of white-tailed deer. See, e.g., 10 V.S.A. § 4741 et seq. (1984 & Supp.1991) (specifying, among other things, when, how, and what type of deer may be hunted); see generally Vermont Department of Fish and Wildlife, Deer Management Plan for the State of Vermont, 1990-95 2-6 (June 1990).
 
 
 122
 Preservation of a healthy white-tailed deer herd, through habitat protection and hunting regulation, serves more than just the interests of hunters. Hunting is important to the economic health of the state, bringing in visitors whose spending boosts local businesses and yields tax revenues. The fees charged for hunting licenses--between $12 (resident) and $75 (nonresident), Vermont Fish and Wildlife Department, Vermont Digest of Fish and Wildlife Laws 13 (1992)--add to the state's revenues as well.
 
 
 123
 Preservation of the white-tailed deer also enables people to observe the deer, and as the Board found, "provides the more intangible benefit of knowing that the deer exist." Put simply, white-tailed deer are part of Vermont's heritage.[16] I believe that the government's goal of protecting deer and their habitat under Criterion 8(A) of Act 250 is for the benefit of the public and undeniably represents a legitimate state interest. See Agins, 447 U.S. at 261, 100 S.Ct. at 2142; Keystone, 480 U.S. at 487, 492, 107 S.Ct. at 1242, 1245.
 
 
 124
 I also believe that a sufficient nexus exists between the Board's actions--denial of Southview's application and alleged permanent designation of Southview's property as within a deeryard--and the state's goal of protecting deer and their habitat. Southview agrees that the deeryard is on its property. Southview does not dispute the Board's findings that (1) destruction of deeryard has occurred in the Stratton area; (2) the Southview property is within the last deeryard in a 10.7 square mile area; (3) the Southview project, as proposed, would destroy 10 acres and imperil 34 acres of the best habitat remaining in the deeryard; (4) the development, as proposed, would likely cause the 20 deer that use the habitat to abandon it and reduce their ability to survive in wintertime; and (5) the "cumulative effect of development in the state is a threat to the entire deer herd."
 
 
 125
 Southview argues that the deer are neither an endangered nor threatened species in Vermont. Historical experience teaches, however, that today's plentiful species may become tomorrow's endangered or even extinct species--witness the fates suffered by the American Bison and the Passenger Pigeon. It is my view that the white-tailed deer population in Vermont need not deteriorate to such a level before the protection of their winter habitat--especially in an area where little such habitat remains--can be said to "substantially advance" Vermont's interest in preserving a healthy and populous deer herd. In fact, it is difficult to imagine a decision rooted in sound game-management principles that would fail substantially to advance legitimate state interests. See generally Christy v. Hodel, 857 F.2d 1324, 1330-31 (9th Cir.1988) (Federal regulations regarding the killing of grizzly bears rationally advance a legitimate government objective.), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989). Thus, it is my view that under the circumstances of this case, Southview cannot prove that the Board's actions fail to "substantially advance legitimate state interests."
 
 
 126
 I conclude that Southview may suffer some economic loss because it can no longer put its property to the precise use for which it sought an Act 250 permit, but that in no way does this potential loss effect a compensable taking.
 
 
 127
 The restrictions imposed on Southview by the Act 250 process redound to the benefit of the public, both Vermonters and non-residents alike. These limits apply to all who seek to place a development--large enough to invoke Act 250 jurisdiction--within the State of Vermont. That all such landowners are subject to these limits enhances the fairness of the statute's permit review process. Moreover, the widespread applicability of the restrictions preserves the natural, unspoiled qualities of Vermont--including the presence of the deer. It is qualities like these that render Vermont an economically viable place for Southview to situate a vacation home development. Like any property owner, Southview can exploit these qualities for profit; but it cannot avoid its responsibility to refrain from destroying them in the process.
 
 
 128
 Having stated these views on the merits of the substantive due process and regulatory taking claims as my own, I nevertheless unqualifiedly join my colleagues in believing that affirmance of the dismissal of these claims for lack of ripeness as above stated is required.
 
 
 129
 Judgment affirmed.
 
 
 
 *
 After argument but before decision, Chief Judge Oakes became a Senior Circuit Judge
 
 
 **
 Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 There is no suggestion, however, that the Board is estopped from denying the Act 250 permit by virtue of Fish and Wildlife's apparent error. Cf. Schweiker v. Hansen, 450 U.S. 785, 788-90, 101 S.Ct. 1468, 1470-72, 67 L.Ed.2d 685 (1981) (holding that federal government employee's error did not justify estopping federal government from applying valid regulation)
 
 
 [2]
 The availability of winter habitat has long limited the abundance and physical condition of deer in Vermont. Indeed, in the mid-1800s, when only about 30% of Vermont's land area was covered with forests, the deer population in Southern and Central Vermont was so decimated that a deer sighting could merit a newspaper story. Despite the existence of a constitutional right to hunt, fowl and fish, see Vt.Const. ch. II, § 67, deer hunting was barred from 1865 to 1896. This regulation, in conjunction with the reforestation of abandoned farmland, enabled the deer population to recover. Vermont Department of Fish and Wildlife, Deer Management Plan for the State of Vermont, 1990-95 2-3 (June 1990)
 
 
 [3]
 Essentially, a regulatory taking--also known as inverse condemnation--occurs when the purpose of government regulation and its economic effect on the property owner render the regulation substantively equivalent to an eminent domain proceeding and, therefore, require the government to pay compensation to the property owner. See Yee, --- U.S. at ----, 112 S.Ct. at 1526; Agins v. City of Tiburon, 447 U.S. 255, 258, 100 S.Ct. 2138, 2140, 65 L.Ed.2d 106 (1980)
 
 
 [4]
 This may seem inconsistent with the rest of the Act, especially where deeryards are involved. But courts cannot expect legislatures to be omniscient or not subject to compromise
 
 
 [5]
 And, unlike the physical occupation at issue in Loretto, deemed especially offensive because the occupier was a "stranger," Loretto, 458 U.S. at 435, 102 S.Ct. at 3176, here the deer are not strangers to their winter habitat--the deeryard
 
 
 [6]
 Although Southview maintains that Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), provides critical support for its physical taking claim, Nollan is largely irrelevant to this claim because it involved a regulatory taking, rather than a physical taking. See id. at 834, 838-42, 107 S.Ct. at 3147, 3149-51; see also Yee, --- U.S. at ----, 112 S.Ct. at 1529-31. The Nollan Court did state in dictum that, had California required the property owners to grant the public an easement across their beachfront property, such government action would have constituted a physical taking. Nollan, 483 U.S. at 831-32, 107 S.Ct. at 3145-46. Yet even this dictum is wholly inapplicable to Southview's physical taking claim because, as discussed above, the Board has not required Southview to submit to a physical invasion by the deer
 
 
 [7]
 We digress to make a point relevant to the merits of Southview's substantive due process claim. Under the facts of this case, we discern no difference between the test for a determination of the validity of Southview's regulatory taking claim, and that for Southview's substantive due process claim under the theory that the Board has gone "too far." By its terms, a due process violation under this theory--a theory the Supreme Court flirted with, but did not approve, in Williamson--can only occur if the regulation has the same effect as a taking by eminent domain. Accordingly, we view this test as co-extensive with the inquiry we face under a claim for a regulatory taking. See also Stoebuck, supra, at 1098
 
 
 [8]
 Although a taking claim will not be ripe without a final decision, "[a] property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain this determination." MacDonald, 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7 (citing Williamson, 473 U.S. at 205-06, 105 S.Ct. at 3126-27 (Stevens, J. concurring))
 
 
 [9]
 We previously have applied the Roth test to substantive due process claims arising from government land use decisions such as a local authority's denial of a building or zoning permit. I see no relevant distinction, however, between local zoning and building regulations and the state-wide land use scheme embodied in Act 250. Both may diminish the value of property by barring a potential use, but the loss of value is likely offset in part "by an increase in value which flows from similar restrictions as to use on neighboring properties." Penn Central Transp. Co. v. New York City, 438 U.S. 104, 139-40, 98 S.Ct. 2646, 2667, 57 L.Ed.2d 631 (1978) (Rehnquist, J. dissenting). Act 250, as with zoning regulations within a municipality, applies to all property owners within the State of Vermont, "not only for the benefit of [the state] as a whole but also for the common benefit of one another," yielding "an average reciprocity of advantage." Id. at 140, 98 S.Ct. at 2667 (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). This rationale would seem especially compelling in the context of a mountain-area vacation home development, where the uses to which other landowners put their property, and the resultant quality of the surrounding environment, is quite relevant to the market value of the lots. Accordingly, I would find the Roth test applicable to Act 250 permit determinations
 
 
 [10]
 On appeal, Southview has advanced no claim of error with respect to the district court's dismissal of its equal protection claim
 
 
 [11]
 Pennsylvania common law, at the time, recognized three distinct estates in mining property: the surface, the right of support, and the right to mine below the surface. See Carol M. Rose, Mahon Reconstructed: Why the Takings Issue is Still a Muddle, 57 S.Cal.L.Rev. 561, 563-64 (1984)
 
 
 [12]
 Moreover, many believe Mahon was substantially overruled in Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). In Keystone, the Court rejected a facial attack, under the Takings Clause, on the Subsistence Act, a Pennsylvania mining statute. Id. at 501-02, 107 S.Ct. at 1250-51. The Subsistence Act, however, interfered with the property interests of mining companies in a manner "strikingly similar" to the Kohler Act--the act at issue in Mahon. Keystone, 480 U.S. at 506-07, 107 S.Ct. at 1253 (Rehnquist, J., dissenting)
 However, Mahon was heavily relied upon by the majority in Lucas. And the Keystone majority, as well as Mr. Justice Stevens, dissenting in Lucas, distinguished Mahon from Keystone on the basis that "the regulatory function of the [Subsistence Act]" was substantially broader." Id. --- U.S. ----, 112 S.Ct. at 2923 (Stevens, J., dissenting). As Mr. Justice Stevens explained: "Unlike the Kohler Act, which simply transferred back to the surface owners certain rights that they had earlier sold to the coal companies, the Subsistence Act affected all surface owners--including the coal companies--equally." Id. (citing Keystone, 480 U.S. at 486, 107 S.Ct. at 1242).
 
 
 [13]
 The economic effect of a taking has also been characterized as "undue interference with ... investment-backed expectations." Keystone, 480 U.S. at 485, 107 S.Ct. at 1242
 
 
 [14]
 In its Act 250 application, however, certified as true and accurate by its general partner, it indicated a construction cost of $250,000 for a 32 lot residential development
 
 
 [15]
 With respect to the meaning of "involving," section 6001(3) explains: "In computing the amount of land involved, land shall be included which is incident to the use such as lawns, parking areas, roadways, leaching fields and accessory buildings." 10 V.S.A. § 6001(3) (Supp.1991)
 
 
 [16]
 In Conservation Society of Southern Vermont, Inc. v. Volpe, 343 F.Supp. 761, 767 n. 1 (1972), aff'd, 508 F.2d 927 (2d Cir.1974), vacated, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), the court quoted the following:
 Green Mountain Mary, Green Mountain Mary,
 What does your garden grow?
 Violets, moss, ground pine, goldenrod, briars,
 Strawberries, hardhack, wintergreen, ferns,
 And a little bit of grass, alas.
 Will you sell me your meadow?
 Oh, no.
 Who crops it?
 Deer.
 See here, Green Mountain Mary, you people are very,--
 Excuse me--
 Queer.
 G. Taggard, "The Nursery Rhyme and the Summer Visitor," A Part of Vermont (1945), quoted in Time in New England 231 (1950).