**CEDARWOOD LAND PLANNING,**
Plaintiff,

v.

**TOWN OF SCHODACK, Through the SCHODACK PLANNING BOARD and the Schodack Town Board, Defendants.**

No. 95–CV–1834.

United States District Court,
N.D. New York.

Jan. 31, 1997.

The Eriole Law Offices, East Greenbush, NY (Joseph P. Eriole, of counsel), for Plaintiff.

Dreyer, Boyajian LLP, Albany, NY (Daniel J. Stewart, of counsel), for Defendants.

## MEMORANDUM, DECISION AND ORDER

McAVOY, Chief Judge.

This action focuses upon the circumstances surrounding plaintiff Cedarwood Land Planning's ["Cedarwood"] attempt to develop a residential subdivision on land it owns in the defendant Town of Schodack [the "Town"]. Cedarwood alleges that the Town, through the Schodack Planning Board [the "Planning

Board"] and the Schodack Town Board [the "Town Board"], diminished the value of the land through the zoning, environmental and planning approval processes at issue. Cedarwood claims violations of the state and federal constitutions, and 42 U.S.C. § 1983.

Defendants now move to dismiss the Complaint, or in the alternative, for summary judgment.

## I. BACKGROUND

### A. Regulatory Summary:

Before delving into the facts of this case, the Court will review some of the regulatory and procedural background involved, the alleged manipulation of which serves as the framework of many of plaintiff's contentions.

### (1) SEQRA

The State Environmental Quality Review Act ("SEQRA") is codified in Article 8 of New York's Environmental Conservation Law. SEQRA provides a comprehensive assessment scheme by which environmental considerations play a mandatory role in governmental decisionmaking early on in certain proposed actions. *See Billerbeck v. Brady,* 224 A.D.2d 937, 637 N.Y.S.2d 890, 891 (4th Dep't 1996); *WEOK Broadcasting Corp v. Planning Bd. of Town of Lloyd,* 165 A.D.2d 578, 568 N.Y.S.2d 974, 975 (3d Dep't 1991), *aff'd,* 79 N.Y.2d 373, 583 N.Y.S.2d 170, 592 N.E.2d 778 (1992); N.Y.Envtl.Conserv.Law § 8–0103 (McKinney 1984) [hereinafter "ECL"]. The "actions" subject to SEQRA's requirements include "projects or activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use or permission to act by one or more agencies[.]" ECL § 8–0105(4)(i).[1]

SEQRA's primary mechanism for ensuring the environmental integrity of such actions is

---

**1.** SEQRA's regulations further define "actions" as

    projects or physical activities, such as construction or other activities that may affect the environment by changing the use, appearance or condition of any natural resource or structure, that:

    \*    \*    \*    \*    \*    \*

    (iii) require one or more new or modified approvals from an agency or agencies[.]

    6 NYCRR § 617.2(b)(1)(iii).

the requirement of an Environmental Impact Statement ("EIS"). ECL § 8–0109. The EIS, to be prepared by either the applicant seeking agency approval for an action or by the agency itself, must contain: (1) a description of the proposed action and its environmental setting; (2) the short- and long-term impact of the proposed action; (3) resulting unavoidable environmental effects and irreversible resource commitments, should the proposal be implemented; (4) alternatives to the proposed action; (5) proposed measures to minimize environmental impact; and (6) where applicable, the growth inducing aspects and effects on use and conservation of energy resources of the proposed action. ECL § 8–0109. Such a statement "provides a means for agencies, project sponsors and the public to systematically consider significant adverse environmental impacts, alternatives and mitigation ... [and] facilitates the weighing of social, economic and environmental factors early in the planning and decision making process." 6 NYCRR 617.2(n).

The SEQRA process itself takes a considerable amount of time, and must begin "as soon as an agency receives an application for funding or for approval of an action[.]" 6 NYCRR § 617.6(a)(1). The first step is to classify the proposed action, i.e., determine whether it is subject to SEQRA's regulations.[2] Id. § 617(a)(1)(I). If it is, the coordinated review process begins with the project sponsor identifying all "involved agencies" in an Environmental Assessment Form ("EAF"). Id. § 617.6(a)(2). Involved agencies are those having "jurisdiction by law to fund, approve or directly undertake an ac-

tion," even if an application for such approval has not yet been submitted at the start of the SEQRA process. Id. § 617.2(s). These agencies then choose a "lead agency" from among themselves to coordinate the review process. 6 NYCRR § 617.6(b)(3)(I). The lead agency completes the EAF, providing information describing the proposed action, its purpose and potential environmental impacts. Id. § 617.21 (App. A).

The lead agency next is responsible for determining the significance of the proposed action. Id. § 617.7. To require an EIS, the lead agency must find at least one potentially significant adverse environmental impact ("positive declaration"). Id. § 617.7(a)(1). If there will be no adverse environmental impacts involved, or if such impacts would be insignificant, no EIS will be required ("negative declaration"). Id. § 617.7(a)(2).[3]

Once a positive declaration is issued, the EIS process begins. Under article 8, the EIS may be prepared by the applicant or the lead agency, at the applicant's option. ECL § 8–0109(4). Should the applicant choose to prepare the EIS, a draft EIS is first prepared for submission to the lead agency. 6 NYCRR 617.8(c).[4] If the draft EIS is deemed inadequate by the lead agency, it must identify in writing the deficiencies and provide such information to the sponsor. 6 NYCRR § 617.9(a)(2)(I). The lead agency then has thirty days from receipt of any resubmitted draft EIS to determine its adequacy. Id. § 617.9(a)(ii).

Upon approval, the lead agency files and publishes a notice of completion of the draft

---

2. The broad category of actions that are subject to SEQRA review, known as "Type I" actions, includes the construction of new residential units that meet or exceed specified thresholds. 6 NYCRR § 617.4(a)(5)(I)(v). "Type II" actions, which now include "excluded" and "exempt" actions, are not subject to SEQRA review. See 6 NYCRR 617.5.

3. SEQRA provides a non-exhaustive list of criteria to be used in making the determination of significance. 6 NYCRR 617.7(c)(1). Those criteria include, but are not limited to: substantial changes in air, ground or surface water quality or quantity, traffic or noise levels; the removal of vegetation or fauna; interference with wildlife or their habitats; the impairment of character or quality of important historical, archaeological,

architectural or aesthetic resources; and the creation of hazards to human health. Id.

4. Since the ultimate determination of the adequacy of the draft EIS is left to the lead agency, "scoping" is available to reduce the risk of extensive re-drafting and resubmission. "The primary goals of scoping are to focus the EIS on potentially significant adverse impacts and to eliminate consideration of those impacts that are irrelevant or nonsignificant." 6 NYCRR § 617.8(a). The scoping process involves the project sponsor submitting a draft scope to the agencies for review and public comment, id. § 617.8(b)–(e), and results in a final scope which will identify, inter alia, particular issues that need not be addressed in the draft EIS. Id. § 617.8(f)(7).

EIS. 6 NYCRR § 617.9(a)(3). This filing marks the beginning of minimum 30–day period of public comment on the draft EIS; public hearings may also be held at the option of the lead agency. *Id.* § 617.9(a)(4). Within 45 days after the close of any such hearings, or if no hearings are held, within 60 days from the filing of the draft EIS, the lead agency must file a final EIS, consisting of the draft EIS and its revisions, summaries of public comments received, and the lead agency's responses to such comments. *Id.* § 617.9(b)(8). If, however, the lead agency feels that specific adverse environmental impacts were not addressed, or were inadequately addressed due to proposed changes in the project or a change in circumstances related to the project, it can require a supplemental EIS. *Id.* § 617.9(a)(7). With this requirement, all of the draft EIS procedures are followed anew. The supplemental EIS may then be incorporated into, and addressed by, the final EIS.

Within thirty days after filing the final EIS, the lead agency must file a written findings statement and decision on whether or not to approve the action. 6 NYCRR § 617.11(b). If the lead agency determines that the action should be approved, the findings statement must (1) certify that SEQRA's requirements have been met; and (2) certify that adverse environmental effects revealed in the EIS process will be minimized or avoided to the maximum extent possible. ECL 8–0109(8); 6 NYCRR 617.11(d)(5). If the agency decides not to approve the action, written findings must also be made stating the facts relied upon in the final EIS for such a determination.

### (2) Town of Schodack Requirements

#### (a) Procedural Requirements

In addition to the SEQRA procedures, provisions in the Town Code of the Town of Schodack are at issue. Those procedures are set forth in the Code of the Town of Schodack, Subdivision of Land and Design and Construction Standards, Chapter 188 (1991 and Amend.) (hereinafter "Town Code").

[*See* Affidavit of Daniel J. Stewart ("Stewart Aff."), Ex. E].

The Town requires that the owner of the land proposed for subdivision first submit a sketch plan to the Director of the Planning Board for classification and discussion. Town Code § 188–4(a). After preliminary discussion of regulatory requirements at a board meeting, the Planning Board classifies the plan as a major or minor subdivision. *Id.* § 188–4(B)(2). If classified as a major subdivision, the developer will then file a preliminary plat for approval. *Id.* § 188–6.

A public hearing will be held within 45 days from submission of the plat. Town Code § 188–6(F)(1). Within 45 days of that hearing, the Planning Board must act to conditionally approve, conditionally approve as modified, disapprove, or grant final approval. *Id.* § 188–5(F)(1).[5] After preliminary approval of the plat, the developer must apply for final approval from the Planning Board. *Id.* § 188–7. Within 45 days, another public hearing is held, *id.* § 188–7(E), and the Planning Board's final approval or disapproval is due within 45 days of the hearing. Town Code § 188–7(F).

#### (b) Zoning Requirements

The Town's Zoning Schedule provides that in a Residential Agricultural ("RA") district, single family dwellings are required to have a minimum lot area of 60,000 square feet. Town of Schodack Zoning Schedule of Area and Bulk Requirements, Part I [hereinafter "Zoning Schedule"] [Affidavit of Salvatore Ferlazzo ("Ferlazzo Aff."), Ex. F]. Prior to 1992, however, the Zoning Schedule had a density bonus provision in effect, by which multiple dwellings served by central sewer and water required minimum lot areas of 20,000 square feet.

The density bonus provision was eliminated from the Town Zoning Schedule by Local Law # 5, adopted December 10, 1992. [*See* Ferlazzo Aff.Ex. C].

---

**5.** This forty-five day period, however, will be extended as required until the SEQRA process has been completed. Town Code § 188–5(F)(1).

## B. Facts: [6]

In 1987, Cedarwood purchased 63 acres of land in the Town of Schodack for the purpose of developing a housing subdivision. [Compl., ¶¶ 3–4; Stewart Aff., ¶ 3]. The property in question is zoned RA with a minimum lot size of 60,000 square feet; at the time the land was purchased, however, the density bonus provision was in effect, enabling the lot size to be reduced to 20,000 square feet if the developer proposed proper central water and drainage. [Ferlazzo Aff., Ex. F., Part 1].

Taking advantage of the density bonus provision, Cedarwood submitted a proposal for 116 units to the Planning Board in 1987. [Stewart Aff., Ex. F (Transcript of Planning Board Hearing, Sept. 7, 1992) at 9]. Because of the potential environmental impact of the proposal, SEQRA review was required; defendants assert without documentation that a positive declaration was made in September of 1987. [Stewart Aff., ¶ 12]. Defendants further allege that a *completed* draft EIS was not filed with the Planning Board until May of 1990. [Stewart Aff., ¶ 12, Ex. F at 7]. This assertion, however, must be qualified in light of plaintiff's submissions.

In his affidavit, Cedarwood President Richard P. Benko asserts that a draft EIS was submitted on September 12, 1988. [Benko Aff. at 1]. Benko also submits a September 22, 1988 letter from Engineer Doug Clark (whose engineering firm was retained by the Planning Board as review engineer for the project in July of 1988) to the Planning Board, stating that "[t]he revised DEIS dated 12 September 1988 for this project is satisfactory with respect to scope, content and adequacy and we recommend acceptance by the Lead Agency." [Benko Aff., Ex. B].

Furthermore, other correspondence submitted by Cedarwood indicates that Clark Engineering was in fact reviewing a submitted draft EIS from September of 1988 until April of 1990.[7] [*See* Benko Aff., Ex. B, C, D, E, F]. Thus, Stewart's assertion in his affidavit that "a *completed* [draft EIS] was not filed with the planning Board until May of 1990", [Stewart Aff., ¶ 12] (emphasis added) may refer only to the point at which the Planning Board *considered* the draft EIS complete.

Public hearings were held on the draft EIS in June and August of 1990. [Stewart Aff., Ex. F at 7]. At some point, concerns arose among members of the public regarding the proposed sewage disposal system. [Affidavit of Plaintiff's Engineer Thomas Brewer ("Brewer Aff."), ¶ 7; Stewart Aff., ¶ 13]. As originally designed, the subdivision utilized an extended aeration system (a "package plant"), followed by filtration, with surface discharge into the Vierda Kill. [Brewer Aff., ¶ 7; Stewart Aff., ¶ 13 and Ex. F at 9]. This proposal, however, eventually was abandoned

---

**6.** This statement of facts is drawn largely from defendants' Local Rule 7.1(f) statement and plaintiff's and defendants' affidavits. In accordance with the Local Rules, all of the material facts set forth in defendants' Rule 7.1(f) statement are deemed admitted unless controverted by plaintiff's Rule 7.1(f) statement. Since plaintiff has taken issue with *some* of the facts as set forth in defendants' statement, where the parties are at odds as to a factual issue, the Court will so note.

**7.** This correspondence indicates that in August of 1989, Clark Engineering raised concerns with the draft EIS regarding (1) the adequacy of the building foundations on poor draining soils; (2) the sufficiency of water wells; (3) the propriety of the proposed wastewater treatment system with discharge to the Vierda Kill (suggesting that the draft EIS should consider alternative systems); and (4) various concerns regarding transportation, recreation, solid waste disposal and agriculture. [See Benko Aff., Ex. C (Aug. 21, 1989 Letter from Clark Engineering to Brewer Engineering, Plaintiff's Engineer)].

By February of 1990, Clark's review was nearing completion. [Benko Aff., Ex. D]. In April of 1990, Clark once again wrote Brewer with the final review of the draft EIS. This letter offered comments regarding various items that should be included in the draft EIS, such as plans showing test hole results of the soils, a phasing schedule, plans showing existing natural resources, and certain reports and plans regarding groundwater and water supply. [Benko Aff., Ex. E (letter of April 6, 1990 from Clark to Brewer)]. Clark followed with a letter informing Brewer that the Planning Board resolved at an April 16 meeting that the draft EIS was deficient in those respects mentioned in Clark's April 6 letter. [Benko Aff., Ex. F]. Brewer responded on April 24, noting that many of the matters raised by Clark were being included in the draft EIS, and that other concerns were design-oriented and thus inappropriate for inclusion. [Benko Aff., Ex. G].

in favor of subsurface discharge. By the time Cedarwood submitted the final EIS in June of 1992, the size of the project had been reduced to 83 units, and the sewage treatment proposal utilized individual septic tanks with each unit, with effluent running through normal sewer lines to a central treatment facility ultimately resulting in subsurface disposal. [Stewart Aff., ¶ 13].[8]

On June 1, 1992, the final EIS was deemed complete by the Planning Board. [Stewart Aff., ¶ 14, Ex. F at 8]. On June 15, however, the Planning Board's acceptance was rescinded, apparently due to concerns that they had not acted in compliance with correct SEQRA procedure. Specifically, the Planning Board expressed concern over its own failure to hold public hearings regarding the changes in the draft EIS concerning sewage and the reduction in units. [Benko Aff., Ex 2 (Transcript of June 15, 1992, Meeting of Planning Board)]. Thus, the Planning Board required that a supplemental EIS be prepared addressing these and other issues. [*Id.*].

Cedarwood submitted the supplemental EIS in August of 1992. [Benko Aff., Ex. V]. Again, after review and suggestions by Clark, the supplemental EIS was revised, and was deemed complete by Clark in October of 1992. [Benko Aff., Ex. W, X]. A public hearing was held on December 7, 1992. [Benko Aff., Ex. Y; Stewart Aff., ¶ 15 and Ex. F].

In the meantime, defendants assert that sometime in 1992, the Town Board became concerned about small lot zoning under the density bonus provision, and its effect on aquifer water quality and the community's rural setting. [Ferlazzo Aff., ¶ 4]. Thus, defendants assert, a long range planning commission was established, and a proposal to rescind the density bonus provision was introduced on August 13, 1992; the measure was adopted as Local Law # 5 on December

10, 1992. Clark suggested to the Planning Board that the law might apply to the Cedarwood Development, and recommended that Cedarwood seek legal representation as to its ramifications. [Benko Aff., ¶ Y].

Cedarwood sought a variance from Local Law # 5 in January of 1993. This request was denied in April of that year, on the basis that Cedarwood did not have vested rights sufficient to waive the requirements of the new law. [Benko Aff., Ex. AA; Ferlazzo Aff., Ex. I]. Thus, Cedarwood's next supplemental EIS, dated November of 1993 (and revised in January of 1994), proposed only 31 single family dwellings with a minimum lot size of 60,000 square feet per lot, in compliance with the amended zoning ordinance. [Stewart Aff., ¶ 17 and Ex. G]. Clark's concerns regarding the sewage disposal system persisted, however [Stewart Aff., Ex. I], and the proposal was further scaled down to 12 units in the final EIS dated December 1, 1994.

The final EIS, proposing 12 units, was accepted by the Town Board on June 17, 1995. [Stewart Aff., ¶ 18].

## C. Procedural History:

Plaintiff commenced this action on December 1, 1995 against the Town, the Town Board, and the Planning Board in New York State Supreme Court, Rensselaer County. Plaintiff asserts that (1) the Planning Board's passage of Local Law # 5, and its refusal to grant plaintiff an exception thereto constituted a taking in violation of the Constitutions of the State of New York and the United States; (2) the enactment of Local Law # 5 constituted a denial of plaintiff's substantive due process rights under the New York and Federal Constitutions, in violation of 42 U.S.C. § 1983; (3) Local Law # 5 deprives plaintiff of liberty and property, in violation of the New York and Federal Constitutions,

---

**8.** Again, the parties disagree as to the impetus for these changes. Defendants argue that the original sewage proposal "was so inadequate and inconsistent with the ground water table that it was completely scrapped by the developer," [Stewart Aff., ¶ 13], and that the reduction in the number of units came about "in response to the public outcry regarding the development." [Def. Rule 7.1(f) Stat., ¶ 7].

Cedarwood, however, asserts that the reduction in units was due to Clark's request that Brewer recalculate the maximum allowable density under the cluster development zoning provisions. [Pl. Rule 7.1(f) Stat., ¶ 2(b); Benko Aff., Ex. J, R].

and 42 U.S.C. § 1983; and (4) the enactment of Local Law #5 deprived plaintiff of the equal protection of the law, in violation of the New York and Federal Constitutions, and 42 U.S.C. § 1983.

Plaintiff seeks a declaration of its exemption from Local Law #5 on the basis of these alleged violations, a declaration that the law is stricken, and $5,600,000.00 in compensatory damages, as well as attorneys' fees and costs.

Defendants removed the action to this Court by notice of removal filed December 22, 1995, and answered the Complaint on January 2, 1996. Defendants filed the present motion on October 21, 1996.

## II. DISCUSSION

### A. Defendant's Motion to Dismiss/Summary Judgment.

Defendants move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiff's Complaint for failure to state a claim upon which relief may be granted, or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. Rule 12(b) provides, however, that where matters outside the pleadings are submitted to and considered by the Court on a motion to dismiss under Rule 12(b)(6), "the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). The Second Circuit mandates strict adherence to Rule 12(b) when matters outside the pleadings are submitted. *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir.1991).

Both plaintiff and defendants have submitted voluminous materials on the present motion, which itself is pled in the alternative, putting plaintiff on notice that defendants were moving in part for summary judgment; "[t]hus, the Court finds that the most practical alternative under Rule 12(b) is to treat the Motion as one for summary judgment." *Nason v. American Canadian Tour, Ltd.*, 942 F.Supp. 220, 223 (D. Vermont 1996); *see also Janneh v. Runyon*, 932 F.Supp. 412, 415 and n. 2 (N.D.N.Y.1996); *Dawson v. Drug*

*Enforcement Admin.*, 927 F.Supp. 748, 751 n. 6 (S.D.N.Y.1996).

### (1) The Standard for Summary Judgment.

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *on remand*, 807 F.2d 44 (3d Cir.1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party, *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975), and the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985) *cert. denied* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355).

It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

## (2) The Existence of a Protected Property Right

Defendants first argue that plaintiff's claims under the due process clauses of the New York and Federal Constitutions must fail as a matter of law since plaintiff can prove no protected property interest.

■ To state a claim for a due process violation in the context of a zoning dispute, a plaintiff must establish a valid "property interest" in a benefit protectible under the Fourteenth Amendment at the time of the alleged deprivation. *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir.1995); *Brady v. Town of Colchester*, 863 F.2d 205, 211–212 (2d Cir.1988). Since, however, such property interests "'are not created by the Constitution' ... courts therefore must look to 'existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Brady*, 863 F.2d at 212 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *see also Luck v. Mazzone*, 52 F.3d 475, 477 (2d Cir.1995).

### (a) Vested Rights Under New York Law

■ Under New York law,

where a more restrictive zoning ordinance is enacted, an owner will be permitted to complete a structure or a development which an amendment has rendered nonconforming only where the owner has undertaken substantial expenditures prior to the effective date of the amendment.

*Ellington Const. v. Zoning Bd. of Appeals*, 77 N.Y.2d 114, 564 N.Y.S.2d 1001, 1006, 566 N.E.2d 128, 133 (1990); *see Schoonmaker Homes v. Village of Maybrook*, 178 A.D.2d 722, 576 N.Y.S.2d 954, 956 (3d Dep't 1991); *Forest Creek Equity Corp. v. DEC*, 168 Misc.2d 567, 640 N.Y.S.2d 412, 416 (Sup.Ct.

Monroe County 1996). The first issue is thus whether plaintiff's expenditures, if any, were sufficient to create vested rights in the 83 unit subdivision under the density bonus provision.[9]

Plaintiff does not assert that any construction began on the subdivision prior to the enactment of Local Law # 5; thus, the only expenditures plaintiff conceivably can prove are those relating to preparing and revising the EIS, and any costs associated with the development of the plans. However, "[i]t is well established that, as a general rule, expenses incurred prior to the commencement of the actual construction do not create a vested interest." *McBride v. Town of Forestburgh*, 54 A.D.2d 396, 388 N.Y.S.2d 940, 942 (3d Dep't 1976); *Cooper v. Dubow*, 41 A.D.2d 843, 342 N.Y.S.2d 564, 566 (2d Dep't 1973). Plaintiff concedes that since it did not begin construction of the development, it did not obtain vested rights under the general rule.

Plaintiff asserts, however, that due to the Town's delay during the SEQRA process, principles of equitable estoppel merit a finding of vested rights. Indeed, the Third Department in *McBride* cites in part to *Matter of Jayne Estates v. Raynor*, 22 N.Y.2d 417, 293 N.Y.S.2d 75, 239 N.E.2d 713 (1968), in which the Court of Appeals distinguished two scenarios creating vested rights:

The test in such cases is whether substantial construction expenses have been incurred prior to the effective date of the new law, *or if no building permit has been issued,* whether the property was purchased without knowledge of the proposed change and sums were thereafter expended in anticipation *423 of the issuance of the permit, *but the municipal officials deliberately delayed the processing of the application and misled and hindered the applicant in order to prevent the accrual of any rights.*

*Id.*, 293 N.Y.S.2d at 79, 239 N.E.2d at 715–16 (emphasis added); *see also McBride*, 388 N.Y.S.2d at 943 ("[a]lthough plaintiffs made certain expenditures for an environmental

---

9. The Court focuses upon the 83 unit plan because the reduction from 116 to 83 units did not occur as a result of Local Law # 5; in fact, the 83 unit plan still took advantage of the density bonus provision.

impact study ... and other preliminary inspections, such did not vest any rights in plaintiffs since there was no unnecessary delay, hindrance or misleading by the local officials").[10] This analysis is consistent with *Ellington*'s recognition that the concept of vested rights itself has its roots both in the common law rule granting constitutional protection to non-conforming uses, as well as principles of equitable estoppel. *See Ellington*, 564 N.Y.S.2d at 1005, 566 N.E.2d 128, and cases cited therein.

### (i) Bad Faith Delay by the Planning Board

■ In order to be entitled to vested rights under the density bonus provision based upon an estoppel theory, plaintiff must show that defendants delayed the approval process in bad faith until Local Law # 5 was passed. *See Millerton Properties Assoc. v. Town of North East Zoning Board of Appeals,* —— A.D.2d ——, 643 N.Y.S.2d 169, 170 (2d Dep't 1996); *Figgie Int'l, Inc. v. Town of Huntington,* 203 A.D.2d 416, 610 N.Y.S.2d 563, 566; *Hyslip v. Sloan,* 124 A.D.2d 1060, 508 N.Y.S.2d 732, 733 (4th Dep't 1986), *appeal denied,* 69 N.Y.2d 611, 517 N.Y.S.2d 1026, 511 N.E.2d 85, *cert. denied,* 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 219 (1987).

Plaintiff argues that an issue of fact can be raised as to the Town's motives during the SEQRA process. Brewer asserts in his affidavit that the Planning Board's repeated concerns regarding the draft and final EIS "were unusual in their scope and the time commitment required to meet them. They were generally *not* concerned with our ability to meet town standards, but were requests for alternative designs, and were based upon the Board's expressed refusal to approve a design concept which met code." [Brewer Aff., ¶ 13]. Furthermore, both Brewer and Benko contend that they were contacted by

members of the Planning Board and told that the project would not be approved unless it went below fifty units. [Brewer Aff., ¶ 11; Benko Aff., ¶ 27]. These contentions are buttressed by correspondence between the Town Supervisor and the Planning Board recognizing the impropriety of such communications. [Benko Aff, Ex. P, Q].

Moreover, the evidence submitted by plaintiff shows that at several points throughout the SEQRA process, Clark deemed either the draft or final EIS complete and recommended acceptance by the Planning Board. [Benko Aff., Ex. B, 2]. Furthermore, Clark's remarks at the June 15, 1992 meetings reflect his opinion that social and density issues, ostensibly reasons for the rescission, had already been adequately addressed. [Benko Aff., Ex. 2]. The minutes of the Board meeting of June 1, 1992, indeed indicate that the Board members could find no reason to reject the final EIS. [Benko Aff., Ex. 2 at 1392].

Defendants assert that whatever delay occurred in the SEQRA process was the fault of plaintiff. They point out that significant public opposition to the project arose after the initial approval of the final EIS on June 1, 1992, [*see* Benko Aff. ¶ T; Ferlazzo Aff., Ex. D; Stewart Aff., Ex. F], and that concerns continued as to the adequacy of the sewage disposal systems. [Ferlazzo Aff., Ex. D]. Clark's affidavit also points out alleged inadequacies in plaintiff's initial plans, including the presence of federal wetlands over 18% of the project site. [Clark Aff., ¶¶ 4–7]. Clark also alleges that plaintiff did a less than thorough job revising the EIS as suggested, thus contributing to the delays. [Clark Aff., ¶ 13].

■ The district court in *Orange Lake Associates, Inc. v. Kirkpatrick,* 825 F.Supp. 1169 (S.D.N.Y.1993), *aff'd,* 21 F.3d 1214 (2d

---

10. *See also Orange Lake Associates, Inc. v. Kirkpatrick,* 825 F.Supp. 1169 (S.D.N.Y.1993), *aff'd,* 21 F.3d 1214 (2d Cir.1994). The District Court in *Orange Lake* declined to pass on the question of whether a local regulator's arbitrary or capricious decision denying a permit gives rise to a protected property interest, *id.,* 825 F.Supp. at 1177 n. 6, but nonetheless noted that:

if the reason for the eventual denial of approval for Plaintiff's project was the existence of

the recently passed zoning amendment and the reason the proposal was not approved before passage of the new amendment was delay on the part of the Defendants, and Defendants delay was arbitrary and capricious, Plaintiff may conceivably have a protected property interest.

*Id.* at 1177.

Cir.1994), faced with similar allegations of bad faith delay by a planning board, aptly noted that

> the issue implicates the Defendants' state of mind and the intent behind a host of Town actions. Cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment, as are those in which the issues turn on the credibility of the affiants.

*Id.*, 825 F.Supp. at 1177 (internal quotations omitted). The Court in the present case is compelled to reach the same conclusion on this record, and thus summary judgment cannot be granted on the issue of bad faith delay by the Town. *Id.* at 1178.

### (ii) Entitlement to Approval

■ Contrary to plaintiff's assertions, however, rights will vest under principles of estoppel only when the landowner shows, in addition to bad faith delay by the Planning Board, "that he was 'entitled to the permit as a matter of right by full compliance with the requirements at the time of the application and that proper action upon the permit would have given him time to acquire a vested right.'" *Figgie Int'l, Inc. v. Town of Huntington,* 203 A.D.2d 416, 610 N.Y.S.2d 563, 566 (2d Dep't 1994) (quoting *Pokoik v. Silsdorf,* 40 N.Y.2d 769, 390 N.Y.S.2d 49, 51, 358 N.E.2d 874, 876).

■ Plaintiff's estoppel argument fails in this regard. Defendants correctly point out that approval of the final EIS is not approval of the project itself. Rather, the final EIS merely requires the involved agencies (i.e., those with discretionary authority to approve an action) to assess the environmental im-

pacts of a proposed action, and to take such impacts into account in approving or disapproving a project. Thus, acceptance of a final EIS is not acceptance of the project.

Plaintiff's final EIS was initially approved on June 1, 1992. [Stewart Aff., ¶ 14, Ex. F at 8]. Such approval, however, did not entitle plaintiff, as a matter of right, to approval of the subdivision project itself. Rather, the EIS, as approved, would "form the basis for the decision whether to undertake or approve such action." *Town of Henrietta v. DEC,* 76 A.D.2d 215, 430 N.Y.S.2d 440, 445 (4th Dep't 1980). The material fact in question here is whether or not plaintiff was *entitled* to approval of this project at this time. Plaintiff can raise no genuine issue in this regard; rather, the record shows only that an issue of fact exists as to whether plaintiff's proposal *would* have been approved by the Planning Board.

After the final EIS was initially accepted on June 1, 1992, Clark noted that the next step was the preparation of a Findings Statement, determining that the project is compatible or incompatible with certain additional conditions or mitigation measures. [Benko Aff., Ex. 2 at 1392]. This assertion is consistent with the SEQRA process, which requires that the lead agency's filing of a written findings statement and decision *whether or not to fund or approve an action* be made within 30 days after the filing of the final EIS. 6 NYCRR § 617.11(b). Thus, the approval process had not yet *begun,* since the time in which the Planning Board was required to take action on the subdivision application was tolled during the SEQRA process. *See* Town Code § 188–6(F)(1).[11] Since plaintiff was not entitled to

11. This conclusion is further supported by the SEQRA statute in effect during 1992, and as amended in 1994. Under the statute in effect in 1992, an application for preliminary subdivision approval was not complete until the planning board issued a negative declaration or accepted a draft EIS. *Sun Beach Real Estate Dev. Corp. v. Anderson,* 98 A.D.2d 367, 469 N.Y.S.2d 964, 970 (2d Dep't 1983), *aff'd,* 62 N.Y.2d 965, 479 N.Y.S.2d 341, 468 N.E.2d 296 (1984). This was apparent since preliminary plat approval carried such significant weight; "absent new information, a subsequent modification or rejection of a preliminarily approved subdivision layout is an arbitrary and capricious act subject to invalida-

tion." *Id.* 469 N.Y.S.2d at 969. The *Sun Beach* court noted in dicta, however, that "the final [EIS] need not be prepared until after the final plat has been submitted ...; preparation of a final [EIS] need only precede the agency's final decision to approve an action." *Id.* at 970. As a result of this dicta, and "[g]iven the definitive nature of preliminary approval, many planning boards refused to grant preliminary approval until a [final EIS] had been accepted and SEQRA findings rendered." Terry Rice, *Practice Commentary,* N.Y. Town Law § 276 at 224 (McKinney 1997 Supp.).

approval at any point prior to the enactment of Local Law #5, his rights in the density bonus provision cannot have vested.

### (b) The Planning Board's Discretion

■ Furthermore, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. This "entitlement" test is strictly applied in determining whether a party's interest in land-use regulation is protected by the Fourteenth Amendment. *Zahra*, 48 F.3d at 680; *Gagliardi v. Village of Pawling*, 18 F.3d 188, 192 (2d Cir.1994); *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 F.2d 911, 918 (2d Cir.), *cert. denied*, 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989).

■ "[T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985). Rather than focusing on the probability of the grant or denial of the application, however, this analysis looks to the extent of the discretion that may be exercised by the issuing authority in reaching a decision. *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir.1996); *Zahra*, 48 F.3d at 680 (collecting cases).

■ Under the New York Town Law, planning boards are vested with the authority to weigh the evidence and exercise their discretion in approving or denying approval of a subdivision plat. *M & M Partnership v. Sweenor*, 210 A.D.2d 575, 619 N.Y.S.2d 802, 803 (3d Dep't 1994); *Currier v. Planning Bd. of Town of Huntington*, 74 A.D.2d 872, 426 N.Y.S.2d 35, 36 (2d Dep't), *aff'd*, 52 N.Y.2d 722, 436 N.Y.S.2d 274, 417 N.E.2d 568 (1980); *see also Thomas v. Brookins*, 175 A.D.2d 619, 572 N.Y.S.2d 557, 557 (4th Dep't 1991) ("Whether to approve or disapprove petitioners' subdivision proposal was within the discretion of the Planning Board"). In exercising its discretion, a planning board may consider, *inter alia*, the impact of the development on adjacent territory, *Van Euclid Co. v. Sargent*, 97 A.D.2d 913, 470 N.Y.S.2d 750, 753 (3d Dep't 1983), or the adequacy of a proposed sewage system, *Parmadale Dev., Inc. v. Planning Bd. of Town of Parma*, 35 A.D.2d 904, 316 N.Y.S.2d 842, 843 (4th Dep't 1970). This wide discretion is fatal to plaintiff's due process claims.

■ In keeping with the mandate that "federal courts should not become zoning boards of appeal to review nonconstitutional land use determinations," *Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir.1986), the Second Circuit has consistently rejected claims that a landowner has a constitutionally protected property interest in a building approval or permit where the issuing authority has wide discretion in reaching a determination. *See, e.g., Crowley*, 76 F.3d at 50 (where Zoning Board had wide discretion in granting variance, landowner had no property interest); *Orange Lake Associates*, 21 F.3d at 1224 (adopting district court's conclusion that planning board's discretionary approval powers precluded finding of vested property right in landowner); *Dean Tarry Corp. v. Friedlander*, 826 F.2d 210, 213 (2d Cir.1987) (planning board's wide discretion to reject plan on basis of plan's effect on health, safety and general welfare "prevented [landowner's] expectation of success from rising to the level of certainty required to give rise to a cogni-

Plaintiff has made no showing that he ever obtained preliminary approval of his plat, which, given the "definitive nature" of such approval, would likely show that it was entitled to final approval as a matter of right. On the contrary, Schodack Town Attorney Salvatore Ferlazzo, in his affidavit, asserts that at the time plaintiff was requesting an exemption from the application of Local Law #5, no preliminary approval of the subdivision had been granted. [Ferlazzo Aff., ¶9].

The relation of the SEQRA process to subdivision approval is even more apparent under the revised statute., which "rejects the dicta of *Sun Beach* and requires completion of the SEQRA process, that is, the filing of a negative declaration or the filing of an FEIS and the rendering of SEQRA findings of fact, as a *prerequisite* to the granting of preliminary plat approval." Rice, *Practice Commentary*, N.Y. Town Law § 276 at 970.

zable property right"); *Yale Auto Parts,* 758 F.2d at 59–60 (broad discretion of town officials prevented applicant from having sufficient expectation of success in application approval). Because the Schodack Planning Board had wide discretion in determining whether or not to approve plaintiff's subdivision plan, plaintiff had no constitutionally protected property right in such approval.

Since plaintiff has failed to raise a genuine issue of material fact as to the existence of a protectible property interest, its due process and § 1983 claims must be dismissed.

### (3) Equal Protection

■ A violation of equal protection under the Fourteenth Amendment by selective enforcement arises if:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) ... such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)). Because plaintiff does not allege selective treatment based upon race, religion, or any effort by the Town to punish him for exercising his constitutional rights, he must demonstrate that the Town maliciously singled out his request for an exemption from Local Law # 5 with the intent to injure him. *Crowley,* 76 F.3d at 53.

■ Defendants assert that at least one other developer applied for, and was denied, an exemption from Local Law # 5, thus reducing the proposed development from 124 to 17 units. (See Stewart Supp.Aff., Ex. C). Plaintiff offers no evidence of any similarly situated developer who was *granted* an exemption to Local Law # 5. Thus, plaintiff cannot show an issue of fact as to the first prong of the selective enforcement analysis, and his equal protection claim therefore must be dismissed.

### (4) Plaintiff's Takings Claims

■ Defendants argue that plaintiff's takings claims are not ripe for review. Under *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), a two-part test is use to determine the ripeness of takings clause type claims. *See Southview Associates, Ltd. v. Bongartz,* 980 F.2d 84, 95 (2d Cir.1992), *cert. denied sub nom,* 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993). The first part "requires the government entity charged with enforcing the regulations at issue to have rendered a 'final decision.'" *Bongartz,* 980 F.2d at 95 (quoting *Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116). The second part requires a "plaintiff to have sought compensation if the state provides a 'reasonable, certain and adequate provision for obtaining compensation.'" *Id.* Defendants argue that plaintiff's failure to seek a variance with the Zoning Board from the more restrictive zoning ordinance (as amended by Local Law # 5) compels the conclusion that a final decision has not been rendered.

Plaintiff first argues that seeking such a variance would be futile. Such an argument was rejected by the Supreme Court in *Williamson,* however, which noted that "[t]here is no evidence that [plaintiff] applied to the Board of Zoning Appeals for variances from the zoning ordinance." *Williamson,* 473 U.S. at 188, 105 S.Ct. at 3117. Moreover, plaintiff offers no evidence to support his contention that the Planning Board's denial of his request for an exemption would render futile a request for a variance from the Zoning Board of Appeals. *Cf. Xikis v. City of New York,* 1990 WL 156155 at *6 (E.D.N.Y.) ("the Court notes that the alleged 'hostility' of the Board and the Community Board towards the plaintiff's re-zoning application does not necessarily mean that an application for a zoning variance would be opposed by the Community Board and/or denied by the Board").

Plaintiff ultimately argues that the issue of whether he had vested rights under the density bonus provision and whether he is entitled to a variance from Local Law # 5 are two separate issues, the first of which *was*

finally determined by the Planning Board when it denied his request for an exemption. Thus, seeking a variance, which focuses on a developer's showing of undue hardship if forced to comply with the more restrictive law, would not address plaintiff's injury in being denied his vested rights.

Plaintiff offers no support in the case law for this analysis, and the Court fails to see its logic. The ripeness requirement in the takings context allows courts to "determine adequately the economic loss—a central factor in the inquiry—occasioned by the application of the regulatory restrictions. *Unless a final decision has been rendered, it remains unclear just how far the regulation goes.*" *Bongartz,* 980 F.2d at 96 (emphasis added). The final decision to be determined is not whether plaintiff has vested rights, but "whether [the developer] will be denied all reasonable beneficial use of its property." *Williamson,* 473 U.S. at 194, 105 S.Ct. at 3120. Plaintiff's attempt to separate his denial of an exemption from the possibility of a variance is thus a distinction without a difference:

> [R]esort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. *The Commission's refusal to approve the preliminary plat does not determine that issue;* it prevents respondent from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances. In short, the Commission's denial of approval does not conclusively determine *whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision.*

*Id.* at 193–94, 105 S.Ct. at 3120 (emphasis added). Here, the Planning Board's determination that plaintiff did not have vested rights under the density bonus provision did not conclusively determine whether plaintiff would be "denied all reasonable beneficial use of its property." *Id.* Since plaintiff has not shown that seeking such variances would

be futile, plaintiff's takings claims are unripe for review.

Finally, plaintiff argues that the ripeness objection does not apply to its claim that Local Law # 5 was unconstitutional on its face. Facial challenges based upon the takings clause "do[ ] not depend on the extent to which [landowners] are deprived of the economic use of their particular pieces of property or the extent to which these[ ] petitioners are compensated," and thus are ripe for review. *Yee v. City of Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 1532, 118 L.Ed.2d 153 (1992); *see also Keystone Bituminous Coal Assoc. v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). Thus, plaintiff's claim that Local Law # 5 is unconstitutional on its face is ripe for review, and defendants' motion for summary judgment is denied as to the Third Count of the Complaint.

### III. CONCLUSION:

For all of the foregoing reasons, then, it is hereby

ORDERED, that defendants' motion for summary judgment is GRANTED, and the Complaint dismissed, with respect to plaintiff's due process, equal protection, and § 1983 claims; and it is further

ORDERED, that defendants' motion for summary judgment is GRANTED, and the Complaint dismissed, with respect to plaintiffs claim that Local Law # 5, as applied to plaintiff, was a taking in violation of the New York State and Federal Constitutions; and it is further

ORDERED, that defendants' motion for summary judgment is DENIED with respect to plaintiff's claim that the enactment of Local Law # 5 was an unconstitutional taking on its face.

IT IS SO ORDERED.